BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

MARCH TERM, 1916.

---

LAURA CHRISTY, Administratrix, Respondent, v.
WABASH RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, April 3, 1916.

1. **DAMAGES: RAILROADS: Interstate Commerce: Switching: Local Train.** A refrigerator car was in an interstate carrier's yards at Moberly, Missouri. It was switched onto a track so as to be taken in a local train to Sturgeon in the same State distant about twenty miles, and with the intention to be loaded with eggs to be shipped same day to Chicago, Illinois. It was so loaded and shipped. It was held that the switching at Moberly was interstate commerce.

2. ———: **Safety Appliance Act: Flying Switch.** Although in an instance where an engine is switching a car on an interstate railroad both are equipped with automatic couplers so as to ouple by impact and can be uncoupled without the employee going between them, yet if the mode of doing the switching (as by flying switch) is such that the employee must stand on a footboard of the engine between it and the car and from that position uncouple, there is a violation of the Safety Appliance Act.

3. ———: ———: **Assumption of Risk: Contributory Negligence.** Where death occurs to an employee of an interstate railway by reason of a violation of the Safety Appliance Act of Congress, no question of assumption of risk, or of contributory negligence can arise.

(232) [195 M. A.

4. ———: **Footboard: Ladder: Swinging Between Cars:** A footboard in front of an engine is not a place upon which employees may stand between the engine and a car and uncouple them by leaning over and working the lever. Nor does the location of a ladder at the side of a car carry the implication that it was intended by the law that an employee should stand on such ladder and swing his body around between the ends of the cars in order to reach the uncoupling device.

5. ———: **Judicial Notice: Interstate Commerce Commission Decisions:** .Whether the court should take judicial notice of the decisions and orders of the interstate commerce commission: *Quaere.*

6. ———: ———: ———: ———: **Calling Attention of Court: Duty.** Conceding that a court should take judicial notice of the orders and decisions of the Interstate Commerce Commission, such orders and decisions belong to that class of things judicially noticed which must be brought to the attention of the court by the party desiring to invoke them, and if such attention is not called, the party will not be allowed to invoke them on appeal.

Appeal from Randolph Circuit Court.—*Hon. A. H. Waller,* Judge.

Affirmed.

*James Collet, Ollie Phillips, J. L. Minnis* and *N. S. Brown* for appellant.

*Paul Barnett* and *G. W. Barnett* for respondent.

ELLISON, P. J.—Defendants are receivers of the Wabash Railway Company. For convenience we will treat the company as defendant. It was an interstate carrier of passengers and freight and plaintiff's deceased husband was in its employ as a member of a switching crew at Moberly, Missouri. In attempting to switch a certain car which was intended to be put into a train, deceased was upon the footboard of the engine and fell between it and the car and was killed.

Plaintiff's petition is so drawn that an ordinary cause of action for personal injury under the State law is stated and somewhat intermingled with a statement of a cause of action under the Federal Employer's Liability Act for a violation of the Safety Appliance Act. There

was no demurrer interposed by defendant and we think that under the rule, applied in such circumstances, whereby every reasonable intendment is allowed in favor of the pleading, a cause of action under the Federal statute is stated. So in the trial each party presented instructions, applicable alone to an ordinary action under the State law. As each did this neither can complain. Besides, so far as plaintiff is concerned, she took upon herself an unnecessary burden. The principal question involves a construction of the Federal Safety Appliance Act, connected, as it has been by the parties, with the law applicable to interstate commerce.

The evidence tended to show that deceased, being a member of a switching crew in defendant's yards at Moberly, was ordered shortly after midnight to assist in a "flying switch" of a certain car which was to be placed in position convenient to be put into a local train to be taken out that morning to Sturgeon, a town a few miles below Moberly and in the same State. The evidence showed that both the engine and car were equipped with automatic couplers as provided in the Federal Safety Appliance Act, so that, in ordinary use, they would couple automatically by impact and could be uncoupled without going between the cars. But the evidence further showed that making a "flying switch" would prevent the use of the appliances required by the Safety Appliance Act.

The "flying switch" such as was attempted in this case, was stated by the engineer in this way: "The car is ahead of the engine, then you back up and one man will stand at the switch farther back to throw it between the engine and the car; in order to do that you start and when the car has enough momentum to pass over the switch you give slack by shutting off enough so that the uncoupling may be made by lifting the pin and then for the engine to get away by rapid movement leaving room enough for the man to throw the switch between the car and engine," thus running the car off on another track. The foreman saw deceased take his position on the footboard between the front of the engine and the car. While he did not, in words, tell him to get on the foot-

board, he knew and intended that he or the other switchman should do so. He knew he was in that position in obedience to his order to make the flying switch. He was seen there when the engine started to make the switch. Shortly his cry was heard, "You have killed me." He was then seen lying on the track and died shortly thereafter. No one saw him fall, but there is evidence and circumstances sufficient, tending to show that he fell in endeavoring from his place on the footboard between the engine and car to draw the pin from the coupler.

The chief evidence of the use and destination of this car was that it was taken empty to Sturgeon that day in a local freight train, there loaded with eggs and shipped that day to Chicago, Illinois. This was put in the record in the shape of the following admission:

"Memorandum in regard to A. R. T. car Number 11880 involved in the injury to Edward Christy, switchman, Moberly yards, about 12:55 a. m., March 18, 1915. The car came into Moberly empty March 5th, and was held in Moberly to be used whenever needed. On the day of the accident the car had been billed to Sturgeon empty, and at the time of the accident was being switched for the purpose of placing it in local freight No. 72 in order to take it to Sturgeon. Train No. 72 took it to Sturgeon March 18 and it was there loaded with eggs billed and forwarded on the same day to Chicago, Illinois."

It was also admitted that defendant was an interstate carrier. In addition to this the foreman in testifying, said the car was being put in a convenient place to be put into the local train to be taken to Sturgeon. Besides, defendant's counsel in his statement of defendant's case to the jury admitted the car was being set out to be taken to Sturgeon and then to be loaded with a shipment to go out of the State. He said: "It is true as Mr. Barnett (plaintiff's counsel) states and I think that fact will not be denied, that there was an intention on the part of somebody to ship the car to Sturgeon, and it was the intention of somebody at Sturgeon then to use the car to ship goods out of the State, but that was not the movement being made at the time at all—that the car had not been billed."

The letters A. R. T. descriptive of the car, we assume to mean a refrigerator car, fitted for the shipment of eggs and other produce.

We think that these statements and admissions are broad enough to, at least, make it a question for the jury to say whether the car was being taken from Moberly to Sturgeon for the purpose of receiving the interstate shipment of eggs; and the jury's finding that it was, is a reasonable and proper inference. We will therefore consider it as a fact, that the defendant switched the car from its yards in Moberly and took it to Sturgeon for the purpose of loading it with eggs there awaiting shipment to Chicago, Illinois. The question arising on that state of facts is, was deceased engaged in interstate commerce when he was killed? We think he was.

It was said in Pederson v. Delaware Lakawana & Western Railroad Co., 229 U. S. 146, 152, and in Ill. Central R. R. v. Behrens, 233 U. S. 473, 478, that, "The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged?" In the latter case the employee was a fireman on a switch engine which, at the time he was killed, was being used in moving several cars, "all loaded with intrastate freight," to be taken to a point in the same city and State. While in this case, deceased was engaged in switching a car to a place in defendant's yards where, it is true, it was to be placed in a local train and taken to a station a dozen miles away, but *for the purpose* of being loaded that day with an interstate shipment. No sound reason can be suggested why that was not interstate service. We think it was such se vice in a special and immediate sense. For, the use to which the car was to be put was the already ascertained service of a specific shipment into another State; and that shipment was to be made on the day the car was being switched out of the yards for that use. The fact that it was taken out of the yards at Moberly, a few miles away, would not be different, in effect, from taking it from the yards at Sturgeon. The case while not like the Pederson case, supra. l. c. 151, St. L. & San Francisco Ry. v. Seale, 229 U. S. 156, 161; North

Carolina R. R. Co. v. Zachary, 232 U. S. 248 and N. Y. Central R. R. v. Carr, 238 U. S. 260, falls within the reason of the rule announced in those cases.

We are brought to the question whether there was a violation of the Federal Safety Appliance Act. As stated at the outset it was shown by the evidence that defendant's engine and the car being switched were properly provided with automatic couplers which would couple by impact and which could be uncoupled without going between the cars. But as we have said, they could not be utilized without going between the cars. There was abundant evidence to show that a "flying switch" made by the employee standing on the footboard in front of the moving engine could not be accomplished without standing between the engine and car, or without hanging to the end of the car by placing one foot in a stirrup and reaching some part of the body around between the two. We think in these circumstances a case was made for plaintiff. For, notwithstanding an interstate carrier complies with the Safety Appliance Act, yet if it operates the cars so that the appliances cannot be used without doing the thing the Act seeks to avoid, i. e. going between the cars, it violates the statute as fully as if it had failed to install the appliances.

In Johnson v. Southern Pac. Ry. Co., 196 U. S. 1, it was held that though each of the two cars to be coupled is provided with an automatic coupler which would satisfy the statute, yet if they are of different kind and will not, on that account, couple without the aid of an employee going between, the statute is violated.

In U. S. v. Ill. Central Ry. Co., 77 Fed. 801, the cars were equipped with proper automatic couplers, but were so loaded with lumber that it projected beyond the ends so as to extend out over the uncoupling lever, rendering it necessary for employees to go between the cars; It was held that the statute was violated. That decision was put upon the ground that the manner in which the car was loaded rendered the Safety Appliance inoperative.

In Hohenleiter v. Southern Pac. Ry. Co., 177 Fed. 96, the cars were properly equipped, but the track upon which they were operated was built on such a curve that the couplers could not couple by impact and it was held that the statute was violated.

In Noel v. Q. O. & K. C. Ry. Co., 182 S. W. 787, it was decided by this court that though automatic couplers were provided, yet, if the carrier allowed the opening in the metal plate through which the neck of the draw-bar protruded, to become worn and enlarged so that the bar would lie out of line and the couplers fail to couple by impact, it was a violation of the act.

It is clear that deceased went in between the engine and car to uncouple them, and there is ample evidence in connection with the circumstances, upon which to submit to the jury whether deceased did not fall in the immediate effort to pull or get the pin which would have uncoupled the car. But whether there was or not, can make no difference, since he had to go between in making that character of switch and it is conceded that he went in to uncouple at the proper moment and that he was killed by reason of going in. It certainly can make no difference whether he was killed an instant before he begun the act of uncoupling.

As intimated at the beginning, there is an intermingling of questions of negligence and assumption of risk as though the action was a personal injury case brought under the State law. This is especially shown by instructions for each party. Yet, where, as here, a death results from a violation of the Safety Appliance Act, there is no such thing as an assumption of risk, or contributory negligence. [Southern Ry. Co. v. U. S. 222 U. S. 20; Southern Ry. Co. v. Crockett, 234 U. S. 725, 730; Grand Trunk Ry. Co. v. Lindsay, 233 U. S. 42; Roberts Injuries Interstate Employees, secs. 100, 111.]

But defendant seeks to avoid the foregoing statements of law and fact by a thought which has occurred to counsel since the case was argued and submitted to us for decision. It is now, on motion for rehearing, for the first time, suggested that the Interstate Commerce

Commission adopted a rule or order, which so affected the situation, in the circumstances of this case, as to relieve defendant from any liability on account of the place and position in which deceased was riding and on account of the manner, or mode, of attachment, operation or location, of the safety appliances, particularly the bar with which the coupling was uncoupled. The claim is that section 3 of the Safety Appliance Act of 1910, conferred authority upon the Interstate Commerce Commission ''to designate the number, dimensions, location and manner of application of the appliances provided for by section 2 of this act (as to automatic coupling, etc.) and section 4 of the act of March 2, 1893, . . . and thereafter said number, location, dimensions, and manner of application as designated by said commission shall remain as the standard of equipment to be used on all cars subject to the provisions of this act.'' And that pursuant to that authority, such commission made such designation by its order of March 13, 1911. That designation so located the stirrup and ladder on the side at the end of the car, and so located handles and levers for uncoupling, that a man standing with his foot in the stirrup and holding on to the ladder would necessarily lean a part of his body over between the cars in taking hold of the lever to perform the uncoupling.

Having, in this way, built up permission for the railroad company to so construct its coupling apparatus that to work it, the employee must extend at least a part of his body ''between the ends of the cars,'' defendant next shows that footboards on switch engines are contemplated and allowed by the law, a conclusion drawn by inferences which we do not think should follow. A footboard on the end of a switch engine is not allowed by the statute as a place upon which employees may stand between it and another car and uncouple them by leaning over and working the lever. It is more properly a place to ride from point to point in the yards. Nor does the location of a ladder, at the side, near the end of a car, carry the implication that it was intended by the law that an employee should stand on such ladder and then *swing a part*

*of his body around between the end of the cars in order
to reach the uncoupling device.* To allow such contention
would wipe out the statute and entirely nullify the object
of its enactment. It is a matter of common observation that
cars like the one in controversy are now equipped with
an uncoupling lever so constructed that the employee may
stand in the stirrup and uncouple without even his hand
being between the cars.

But this branch of defendant's case, thus introduced
since the cause was originally submitted, is really wholly
irresponsive to the main ground of defendant's liability;
which was not that it did not have a proper automatic
coupler which could be uncoupled without the ''employee
going between the ends of the cars;'' but that it so oper-
ated its cars by making a flying switch, that such auto-
matic coupler, as we have already stated, could not be
uncoupled without going between the cars.

Defendant has cited us to Devine v. Calumet River
R. R. Co., 259 Ill. 449. We do not see that it has any
application. An employee riding on the footboard of an
engine to make a flying switch with a *flat* car, made the
uncoupling safely and was *afterwards,* as the engine pro-
ceeded on, killed by the engine running off the track on
account of not having a brake. The court held that even
though the car was not properly equipped with an auto-
matic coupler, that was not the proximate cause of the
employee's death.

But we pass by the foregoing considerations to a
point which challenges any right in defendant, at this
time, to call to its aid the action of the Interstate Com-
merce Commission. The point in support of such extra-
ordinary claim is, that we must take judicial notice of
the action of the Commission, and this too, notwith-
standing such matter was not referred to at the trial,
nor mentioned in brief, or argument at the original sub-
mission of the cause in this court. Plaintiff insists that
the action of the commission does not belong to that class
of things of which judicial notice is taken, citing Robin-
son v. Baltimore Railroad, 222 U. S. 506; while defend-

ant asserts the contrary, citing Caha v. U. S., 152 U. S. 211, 221.

If we concede (without deciding) that defendant is right, it is in no position to avail itself of such point for the reason that the matter belongs to that class of things judicially noticed only when the court's attention is called to it.

From motives of necessity, as well as of public policy, courts take judicial notice of general, or public law and their judgments must be supported by such laws whether called to their attention or not. So there are many classes of things of which the courts take judicial notice, or have judicial knowledge. Some of these are so self evident as to be ever present in the mind, so that they naturally enter into a decision of any point to which they have application; as, for instance, knowledge of the order of succeeding days of the week, or months or seasons of the year, of the familiar laws of nature, etc.. But there are other things, which, from motives of policy, the law requires a court to judicially notice, or have knowledge of, but of which, in reality, it is ignorant. It is the duty of a litigant desiring the advantage of that knowledge, to suggest it to the court and to assist the court in examining at the proper sources for actual information. It is said in Note 16, p. 4, 1 Taylor's Evidence, that Lord Ellenborough even refused to take notice of the king's proclamation "on the ground that the Gazette containing it was not produced."

The Supreme Court of the United States, speaking in reference to the question, said that it was the duty of the courts to take judicial notice of legislative journal entries in Illinois, but that "The courts of Illinois may decline to take that trouble, unless parties bring the matter to their attention." [Town of South Ottawa v. Perkins, 94 U. S. 260, 268.] [See, also, State v. Wray, 109 Mo. 594, 598.] Such notice should have been invoked by the defendant. [Walton v. Stafford, 43 N. Y. Supp. 1049; 4 Wigmore on Evidence, sec. 2568.]

The present instance is an apt illustration of the wisdom of the rule requiring the litigant to invoke the

195 M. A.—16

court's judicial knowledge. A particular order made by the Interstate railroad commissioners is not a thing which a court could reasonably know unless its attention was called thereto, and, possibly, the means afforded, if required, for the court to ascertain whether such order in fact existed.

But in addition to this, these orders, as we have said, were never mentioned in the trial court, nor were they referred to in this court, and to bring them into the case at this late day, would violate the rule in this State that a case must be determined, on appeal, on the same theory presented in the trial court.

The foregoing considerations, in effect, dispose of all other objections to the judgment, and it is accordingly affirmed. All concur.