MARGUERITE CORBETT v. TERMINAL RAILROAD ASSOCIATION, Appellant. —82 S. W. (2d) 97.

Division One, April 17, 1935.

*T. M. Pierce, J. L. Howell* and *Walter N. Davis* for appellant.

*Everett Hullverson, Vernell Perry* and *Mason & Flynn* for respondent.

974

STURGIS, C.—This is an action for damages for personal injuries received by plaintiff in consequence of a collision at a grade crossing between an automobile in which she was riding and some moving freight cars pushed by defendant's locomotive engine on

its railroad track. It is the same case that was before this court in Cox v. Terminal Railroad Association, 331 Mo. 910, 55 S. W. (2d) 685, on certification from the St. Louis Court of Appeals, 43 S. W. (2d) 571. The change in the name of plaintiff is caused by her marriage while the case has been pending. Both the pleadings and the facts are stated in the case mentioned and those wishing to know all about the case should read those opinions, from which we learn that the plaintiff was successful on the first trial in obtaining a verdict and judgment, from which defendant appealed, and both the Court of Appeals and this court concurred in reversing and remanding the case for new trial because of errors committed by the trial court in submitting the case to the jury on the humanitarian rule of negligence as applied in this State but not in Illinois where the accident and injury occurred. After such reversal and remanding the case was again tried in the Circuit Court of the City of St. Louis on the same pleadings and with substantially the same evidence. The plaintiff has again prevailed and defendant has appealed.

The principal question raised on this appeal again relates to the instructions, it not being urged now that a demurrer to the evidence should have been sustained. Both sides concede that as the plaintiff's injury occurred in East St. Louis, Illinois, the substantive law of that state applies and each party set forth in their respective pleadings the laws of that state deemed applicable. At the last trial the plaintiff abandoned all her allegations of defendant's negligence causing her injury at the railroad crossing in question except that numbered 7 in her petition, as follows:

"That crossing gates were installed at the said grade crossing; that a watchman was ordinarily maintained at said place but that at the time of the said collision aforesaid, there was no watchman at the said crossing and that there was no one there to operate a warning bell of the approach of any train or cars, and that defendant provided no one there to operate, to lower or raise the said gates while trains or cars were approaching the said highway or crossing, all in violation of rule 2 of General Order 106 of the Illinois Commerce Commission then and there in full force and effect, providing as follows:

"'Hereafter where crossing gates are installed at a grade crossing where any street or highway is crossed by the tracks of any railroad, such gates shall be maintained and operated for the full period of each twenty-four hours; provided in cases where it is absolutely certain that there will be no traffic on the railroad for a period of at least 6 hours in any twenty-four hour period, the gates in which cases may be left without an attendant, and operated only during such periods in the twenty-four hours, as trains are in operation.'

"Plaintiff states that traffic was operated over said crossing at all hours of the day, and that defendant knew or by the exercise of due care would have known thereof."

On the present trial the plaintiff wisely heeded the frequent admonitions of this court as to the dangers in submitting a case to the jury on a measure of damage instruction only, as was done at the first trial, and asked and the court gave this instruction:

"The Court instructs the jury that at the time of the occurrence in question, the law of the State of Illinois provided as follows:

" 'Hereafter where crossing gates are installed at a grade crossing where any street or highway is crossed by the tracks of any railroad, such gates shall be maintained and operated for the full period of each twenty-four hours; provided in cases where it is absolutely certain that there will be no traffic on the railroad for a period of at least six hours in any twenty-four hour period, the gates in which cases may be left without an attendant and operated only during such periods in the twenty-four hours, as trains are in operation.'

"The Court further instructs you that any failure to observe this law would be negligence.

"The Court further instructs you that if you find and believe from the evidence that the plaintiff was being driven across said railroad tracks at the place mentioned in evidence, and that crossing gates were installed there, and that traffic moved on said railroad at all hours of the day, and *during the time plaintiff was crossing the said track;* it then became defendant's duty to maintain and operate the gates there for the full period of twenty-four hours each day, and if you further find and believe from the evidence that the said gates were not maintained and operated for the full period of each twenty-four hours, and if you further find and believe from the evidence that plaintiff was at the said time exercising ordinary care for her own safety, and that plaintiff's automobile was struck by the cars mentioned in evidence, and plaintiff was injured (if you so find) as a direct result of the failure, if any, *to have said gates maintained and operated there at said time,* then the Court instructs you that plaintiff is entitled to recover and your verdict must be in favor of the plaintiff and against the defendant." (Italics are ours.)

Defendant's first assignment of error is that this instruction is erroneous and its first insistence is that the instruction, by quoting the rule prescribed by the Illinois Commerce Commission as to operating crossing gates at railroad crossings *in haec verba* and telling the jury that such was the law of Illinois, where the accident occurred, and that any failure to observe this rule would be negligence, left the jury to construe or interpret law to suit itself without guidance of any kind, and the jury might have concluded that defendant was liable regardless of the violation of the rule being the proximate cause of plaintiff's injury. We confess a difficulty in understanding defendant's reasoning on this point. To my mind the duty imposed on defendant by this rule as to operating crossing gates at grade crossings is so plain and simple that it needs

no interpretation or construction. Certainly every intelligent juror knew, and if not he so learned from the evidence adduced here, the purpose of installing crossing gates at a railroad crossing, and that *when operated* and the gates were open this indicated that there was no danger from approaching trains or cars and that being closed was a warning of such danger. So the rule of law quoted in the instruction required such crossing gates, when once installed, to be *operated* at all times unless there was a period of at least six hours when it was absolutely certain that there would be no traffic on the railroad and during that period the operation might cease. We doubt if we have made the rule any more plain or understandable by this explanation. It is true that the statement following the quotation of the rule that "any failure to observe this law would be negligence" is general and too abstract when standing alone, but this abstract statement, correct in itself, if followed by a specific statement applying the law to the facts of this particular case and telling the jury what particular facts, if found to have been proved, will warrant a finding for plaintiff. This form of instruction is not objectionable when not likely to mislead the jury. [McGrew v. Missouri Pac. Railroad Co., 109 Mo. 582, 589, 19 S. W. 53; Kleinlein v. Foskin, 321 Mo. 887, 900, 13 S. W. (2d) 648.] And since the instruction specifically requires the jury to find that "plaintiff was injured as a direct result of the failure to have said gates maintained and operated there at said time," how can it be said that the jury was not required to find that such failure was the proximate cause? We rule this point against defendant.

■ It is next insisted that this instruction is erroneous in telling the jury that the order of the Commerce Commission of Illinois relative to operating crossing gates at railroad grade crossings therein set forth was the law of Illinois when this accident and injury occurred, June 4, 1928. Plaintiff had so pleaded in her petition and under our statute, Section 806, Revised Statutes 1929, it is prescribed that, "In every action or proceeding wherein the law of another state of the United States of America is pleaded, the courts of this State shall take judicial notice of the public statutes and judicial decisions of said state." Plaintiff had also alleged as one of her grounds of negligence a violation of an ordinance of the City of East St. Louis, where the accident occurred, as to backing cars over a street crossing without lights, and defendant, answering this charge, alleged in its answer that said ordinance was made invalid or annulled by the enactment by the Illinois Legislature of the Public Utilities Act of 1913 and the Commerce Commission Act of 1921 vesting the right to control and regulate the crossing of streets by railroads in the Commerce Commission of that state and withdrawing such powers from cities acting by ordinance, thus curing the defect in plaintiff's petition in that respect; that such was the ruling and construction of such acts by the Supreme Court of Illinois in Village of Atwood

v. Railroad Co., 316 Ill. 425 (a decision rendered April 24, 1925), and Northern Trust Co. v. Chicago Railways Co., 318 Ill. 402. As this court, when same are pleaded, takes judicial notice of the laws of Illinois, the defendant thereby showed that in Illinois, by legislative act, the orders made and rules prescribed by the Commerce Commission of that state to promote or insure safety to travel at public street crossings over railroads had the force and effect of law, and that Rule 2 of General Order 106 of the Illinois Commerce Commission pleaded by plaintiff and recited in plaintiff's Instruction No. 2 was in fact the law of Illinois. It was also thus shown that any ordinance of East St. Louis relating to this same matter was annulled and made inapplicable by the Illinois statute mentioned and that plaintiff could not recover for a violation of such city ordinance. Defendant now asserts, for the first time in its brief in this court, without having pleaded same or called the attention of the trial court thereto in any way unless by the general statement in the motion for new trial, that the court erred in giving and reading to the jury "erroneous, misleading, illegal and prejudicial instructions, that Rule 2 of General Order 106 pleaded by plaintiff, imposing on defendant the duty of having in operation the crossing gates at the crossing in question at the time plaintiff was injured, was in fact not in force and effect as the law of Illinois at the time of plaintiff's injury, June 4, 1928, because such rule and General Order 106 of the Commerce Commission enacted and promulgated many years previous was by a later General Order 119 of the Commerce Commission of Illinois, made and dated June 25, 1925, declared applicable only to road crossings outside of cities, villages and incorporated towns, and that as to cities and towns the protection of grade crossings maintained under municipal ordinances on April 24, 1925, be continued and maintained till further order of the Commission. Defendant claims that this General Order 119 of the year 1925 had the effect of making railroad crossings in cities and towns subject to the regulations provided by city ordinances and exempted such crossings from the provisions of Rule 2 of General Order 106 of the Commerce Commission invoked by plaintiff. Defendant's contention, as we understand it, amounts to this: That the laws of Illinois first vested in municipalities the exercise of the police power to make needful regulations governing the safety of railroad grade crossings therein; that later by the Acts of 1913 and 1921 the Legislature of that state created the Commerce Commission and vested this police power solely in that body and deprived municipalities of the power to enact or enforce ordinances of that character, as held by the Supreme Court of that state; that the Commerce Commission exercised this power by enacting General Order 106, including Rule 2, which plaintiff pleaded and which had the force and effect of law requiring crossing gates to be operated at railroad crossings; that when the Supreme Court of Illinois in the Village of Atwood case,

supra, held April 24, 1925, that this Rule 2 of General Order 106 of the Commerce Commission had superceded and annulled all city ordinance regulation for the safety of railroad crossings, the Commerce Commission in the exercise of its power enacted on June 25, 1925, General Order 119, which again put in force all city ordinances on that subject, and that such was the status of the law of Illinois when this accident occurred. Such city ordinance regulations, however, would be in force and effect as law, not as city ordinances enacted by the city, but as regulations and rules adopted and put in force by the Commerce Commission under its police powers.

The question presented here is whether this court on this appeal can take judicial notice of any such thing as General Order 119 of the Commerce Commission of Illinois and its force and effect, as being part of the laws of that state, without same being pleaded in any way or the attention of the trial court being called thereto. The pleadings, we think, are sufficient to require the trial court and this court to take judicial knowledge that the legislative acts of Illinois have vested in the Commerce Commission of that state the police power of enacting provisions for safeguarding travel on streets and highways at railroad crossings and withdrawn that power from municipalities, and that such Commerce Commission exercised this power in enacting General Order 106, including Rule 2 thereof. But the pleadings in no way mention or allege that General Order 119, or any of its provisions, is the law of Illinois or had the effect of modifying or annulling the provisions of Rule 2 of General Order 106. The general rule of law is that courts of one state do not take judicial notice of the laws of a sister state (23 C. J., sec. 1948, p. 131, and sec. 1950, p. 133), and such was the law in this State prior to the enactment in 1927 of what is now Section 806, Revised Statutes 1929. Prior to the enactment of such statute the law of this State was that when a statute or law of a sister state governed or was vital to any issue in an action pending in a court of this State, the party invoking such statute must both plead and prove such law. [Mathieson v. Railroad Co., 219 Mo. 542, 548, 118 S. W. 9; Madden v. Railroad Co., 192 S. W. 455; Rashall v. Railroad, 249 Mo. 509, 516, 155 S. W. 426; Rositzky v. Rositzky, 329 Mo. 662, 671, 46 S. W. (2d) 591.] Our present statute, Section 806, Revised Statutes 1929, in no way dispenses with the necessity of pleading such foreign statute or law, but merely dispenses with the necessity of making formal proof of same at the trial when same has been properly pleaded. It is only when such law is pleaded that our statute requires the court to take judicial notice of such foreign law. In the Rositzky case, supra, we said: "We are not overlooking the Act of 1927, now Section 806, Revised Statutes 1929, providing that, when properly pleaded, our courts shall take judicial notice of the public statutes of other states. It is just as essential now as previously to

plead a statute from another state when same is essential to a cause of action, and the statute merely dispenses with formal proof of the same at the trial by requiring the courts to take judicial knowledge of the pleaded statute if there be such. Unless such foreign statute is properly pleaded, this statute has no application." We readily agree that under our statute the proper pleading of the law of another state requires our courts to take judicial notice not only of the law itself, such as a statute of such state, but also of the judicial decisions of such state interpreting or construing such law or statute. [Ramey v. Railroad, 323 Mo. 662, 21 S. W. (2d) 873, 877; Menard v. Goltra, 328 Mo. 368, 40 S. W. (2d) 1053.] So, therefore, we take judicial notice of the statutes of Illinois creating the Commerce Commission of that state and investing it with the exclusive police power to regulate the safety of railroad crossings, as held by the Supreme Court of Illinois in the cases heretofore cited, and of General Order 106 of the Illinois Commerce Commission, including Rule 2 requiring crossing gates to be operated at all times, such provisions of the Illinois law having been pleaded. But that does not require the courts of this State to take judicial notice of other general orders of the Commerce Commission, such as General Order 119, which was not pleaded in any way. That was a different statute, or order of the Commerce Commission having the force and effect of a statute, and in order to come within our judicial knowledge should have been pleaded. Defendant says that, "So far as cities, villages and incorporated towns are concerned, it is evident the Rule 2, General Order 106, has been repealed and is no longer in force. Plaintiff has predicated her right to recover in this case upon a law of Illinois that has been repealed." If such be true, then such result was brought about by the enactment of a later law having that effect and such later law should have been pleaded.

It is significant also that while General Order 119, which defendant now insists annulled or greatly modified General Order 106, was in force and effect, if at all, when this case was tried the first time on the same pleadings as here and was before this court and the St. Louis Court of Appeals on appeal, the point was not then raised either by counsel or the court *sua sponte* that such courts should take judicial notice that under the law of Illinois at the time of the accident negligence could not be predicated on the failure of defendant to have its crossing gates in operation at the time and place of the accident.

We also think that this case falls within that class of cases in which courts are required to take judicial notice of matters such as this only when such judicial notice is invoked and the court's specific attention is called thereto. It is said in Baldwin's Century Edition of Bouvier's Law Dictionary, page 613, relative to courts taking judicial notice of certain kinds of facts: "If unacquainted with such fact, the Court may refer to any person or any document or

book or reference for his satisfaction in relation thereto; or may refuse to take judicial notice thereof unless and until the party calling upon him to take such notice produces any such document or book or reference.'' In 23 Corpus Juris, section 2005, page 172, this is said: ''While a fact within the realm of judicial knowledge need not be alleged or proved, yet it must be suggested or presented to the court in some way, at least in some instances. Some matters of judicial knowledge are so self-evident as to be ever present in the mind, so that they naturally enter into a decision of any point to which they have application. But there are other things which, from motives of policy, the law requires a court judicially to notice or have knowledge of, but of which in reality it is ignorant. It is the duty of a litigant desiring the advantage of that knowledge to suggest it to the court. The court is not bound to take judicial notice of a fact where it is not called upon to do so either by counsel or some other facts introduced in evidence and it is one to which the mind of the court would not ordinarily be directed.'' In Christy v. Wabash Ry. Co., 195 Mo. App. 232, 241, 191 S. W. 241, in considering the question of the court taking judicial knowledge of an order of the Interstate Commerce Commission when the point was raised in the Court of Appeals for the first time, the court said: ''From motives of necessity, as well as public policy, courts take judicial notice of general or public law, and their judgments must be supported by such laws, whether called to their attention or not. . . . But there are other things, which, from motives of policy, the law requires a court to judicially notice, or have knowledge of, but of which, in reality, it is ignorant. It is the duty of a litigant desiring the advantage of that knowledge to suggest it to the court and to assist the court in examining at the proper sources for actual information. ·. . . The present instance is an apt illustration of the wisdom of the rule requiring the litigant to invoke the court's judicial knowledge. A particular order made by the Interstate Railroad Commissioners is not a thing which a court could reasonably know unless its attention was called thereto, and possibly the means afforded, if required, for the court to ascertain whether such order in fact existed. But in addition to this, these orders, as we have said, were never mentioned in the trial court, nor were they referred to in this court, and to bring them into the case at this late day would violate the rule in this State that a case must be determined, on appeal, on the same theory presented in the trial court.''

In the present case the question of there being any such thing as a General Order 119 of the Illinois Commerce Commission and its force and effect was first presented by defendant printing in its brief filed here a certified copy of such General Order 119 and not only asks us to take judicial knowledge of same but to convict the trial court of error in not doing so. We decline to do this.

Defendant's second assignment of error is that the court erred "in permitting Dr. McFadden to state to the jury what plaintiff *told said doctor* as to her *condition* and *complaints* at the time the said doctor examined her;" and in arguing this point defendant says: "Over the objection and exception of defendant, the Court permitted Dr. McFadden to testify of plaintiff's complaints, communicated to said doctor by plaintiff." We think that defendant has thus accurately stated the nature and extent of its objections made and exceptions saved to Dr. McFadden's evidence and when so measured the assignment of error cannot be sustained. Dr. McFadden qualified as a medical expert and testified that he examined and treated plaintiff after the accident in question. We think the law is settled that a physician may give in evidence his expert opinion of the condition of his patient, founded on his observation or on the patient's statement of present subjective symptoms, or both. And in giving his opinion the physician may testify not only of what he observed but what the patient told him about present symptoms, but may not give in evidence statements of the patient with respect to his or her past physical condition or the circumstances surrounding the injury or the manner in which the injury was received. [Adolph v. Brown, 213 Mo. 406, 418, 255 S. W. 947.] In Magill v. Boatmen's Bank, 288 Mo. 489, 232 S. W. 448, the rule is stated negatively to the effect that the physician as an expert is not competent to testify what statements the plaintiff made to him as to the loss of blood and pains suffered prior to the time she consulted with him. In giving his opinion he may testify not only what he observed but what the patient told him about her present symptoms, but he cannot testify what she told him respecting her past physical condition for that is mere hearsay. The court there quoted with approval the rule stated in Gibler v. Railroad, 129 Mo. App. l. c. 103, on the authority of Greenleaf on Evidence, "that a physician may give in evidence his expert opinion of the condition of a patient, founded on his observation or on the patient's statement of *present subjective symptoms*, or both, and in giving his opinion the physician may testify not only of what he observed, but what the patient told him about present symptoms." It is perhaps true that some parts of plaintiff's statements as to her injuries and suffering made to Dr. McFadden, as testified to by him, covered her past physical condition and suffering rather than the present, but if so that is not within the objections made in the trial court and the assignment of error here. We might also say here that if defendant thought the jurors were likely to believe that Dr. McFadden's statement of what the plaintiff told him as to her then injuries and suffering would be taken as proof of the truth of such injuries and suffering, the jury should have been instructed, if so requested, to the contrary. To allow a physician to narrate what the plaintiff told him as to her then suffering and

injuries is an exception to the rule against hearsay evidence, but, being admissible, it cannot be excluded. The court can, however, by instruction confine such evidence to its legitimate purpose. We also observe that defendant in presenting its medical evidence as to plaintiff's injuries and suffering pursued the same method of having the doctors tell what plaintiff told them as to her injuries and suffering as well as what they learned by their own observations and investigations.

The remaining assignment of error is that the verdict and judgment for $12,000 is excessive and that a *remittitur* should be required to bring it within reason as a condition of not granting a new trial. At the first trial the jury returned a verdict for plaintiff for $12,500 and the trial court, on motion for new trial, considered the verdict excessive and required plaintiff to reduce the judgment to $7,500 by entering a *remittitur* as the price of not then granting a new trial on that ground. Plaintiff entered the *remittitur* and so that question was not before the Court of Appeals or this court on the former appeal unless such court then considered whether $7,500 was excessive. The evidence here relating to the question of the nature and extent of plaintiff's injuries received at the time of the accident, the after-effects of such injuries on plaintiff's health and ability to earn a living, and the permanency of the conditions resulting from the injuries makes up the large part of the present record of about 400 pages. A large number of medical experts, about an equal number on each side, testified on various phases of this case. It is quite out of the question to give even a summary of this evidence and we will only make a few general observations after having read and reread same and the arguments based thereon. We think we can correctly say that plaintiff received a severe shock when her head struck the steering wheel of the automobile at the first impact of the freight car against same, and when the car stopped and plaintiff attempted to get out of the automobile her dress caught in some manner and she was dragged on the ground some distance by reason of the freight car being pulled in the opposite direction. Plaintiff received bruises, especially above the hip and on the left leg, became temporarily unconscious, and was then taken to a good hospital in East St. Louis near the place of her injury. At this time, June 4, 1928, plaintiff was twenty-one years old, unmarried, and working as a house maid and having the care of children for a family in Chicago, earning $18 per week. She was in previous good health. There is no doubt that plaintiff received good medical treatment and care by competent doctors and nurses at the hospital. A careful examination and diagnosis of plaintiff's condition having reference to her complaints was made with the aid of X-rays, etc. The concensus of the evidence of those attending her there is that nothing of a serious nature was discovered and after three or four days' treatment the

plaintiff was discharged from the hospital and she went to her sister's home in St. Louis. There the sister's family physician was called to treat her and he did so for some five or six months, three weeks at the house and by her calling at the doctor's office the rest of the time. During this time, according to her and her doctor's evidence, she was not physically able to do much, if any, work. She then returned to Chicago and resumed her employment as house maid with the same family at a reduced salary of $12 per week, but being relieved of heavy work such as washing and ironing. She continued this employment till 1930, the accident having occurred June 4, 1928. She married August 6, 1931, pending the former appeal and nearly two years before the last trial. There is no medical evidence as to her physical condition while working in Chicago after this accident or while living with her husband there. The medical evidence relates to her condition while she remained in St. Louis some six months following the accident and to examinations made of her shortly before the present trial in April, 1933. All the evidence shows that plaintiff received no fracture or injury to any bone. The evidence of the doctor (including his substitute while he was temporarily absent) who treated plaintiff while she was in St. Louis for five or six months after her injury and who examined her shortly before the present trial and doubtless at the time of the first trial in December, 1929, gave her condition as much more serious than the hospital examination indicated. He said she had a damaged kidney and disorders causing unusual and too frequent menstruations and he found this condition still existing at the time of this trial; that from the conditions he thought she received a concussion of the brain in the accident causing nervousness and nerve disorders, resulting in partial loss of feeling in and atrophy of the left leg. He testified at this trial that she was suffering from these permanent injuries: (1) Injury to the nervous system indicated by the reflexes and the sensory changes in the leg; (2) injury to the back evidenced by the muscular spasm in the sacroiliac region; (3) injury to the womb evidenced by abnormal menstruation; (4) injury to her kidney shown by the history of there being blood and now albumin in the urine. The court, on defendant's motion, appointed a physician shortly before the present trial to make an examination of the plaintiff's physical condition and ailments. This physician was selected by the trial judge and there is no suggestion that he was not competent, disinterested and fair. He made a thorough examination of plaintiff on two occasions, giving particular attention to plaintiff's complaints. He was called as a witness by defendant and testified that he found nothing to indicate that plaintiff was suffering from any serious injury or malady, present or past; that she was a normal, well-developed woman; that she had a congenital malformation of the bones of the sacrum, not serious, but making her

more susceptible to injury than if natural. He admitted that her nervous and womb troubles might have been aggravated by the automobile accident.

Much more might be said along this line, but it would merely prolong the opinion. We have concluded on a careful consideration of the whole evidence that the verdict is excessive. We usually defer to some extent to the opinion of the trial judge as having superior means of judging the credibility of the witnesses and the weight of the evidence, but the judge who tried this case the first time came to the same conclusion which we reach. The first trial judge concluded that $7,500 was the limit of damages allowable. Because of the lapse of time, that amount will be increased to $8,000 as being within reasonable limits. Our conclusion is that if plaintiff will enter a *remittitur* in this court of $4,000 within ten days, a judgment will be entered here for $8,000 as of the date of the present judgment; otherwise, the case will be reversed and remanded. It is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur, except *Coles, J.*, not sitting.