PRUDENTIAL INSURANCE COMPANY *v.* CARRIE H. SHUMAKER

[No. 2, April Term, 1940.]

190

*Decided April 24th, 1940.*

The cause was argued before OFFUTT, PARKE, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*F. Brooke Whiting* and *Robert H. McCauley,* for the appellant.

*William L. Wilson, Jr.,* with whom were *Edward J. Ryan* and *Charles F. Wagaman* on the brief, for the appellee.

JOHNSON, J., delivered the opinion of the Court.

The Prudential Insurance Company of America, on October 29th, 1936, issued a twenty-year endowment policy in the amount of $1000 to Edith M. Baker of Somerset County, Pennsylvania. The beneficiary named in the policy was Carrie H. Shumaker, mother of the insured, and appellee in this case.

The insured died at her home on February 24th, 1937, from a cause undisclosed by the record, while the policy was in full force and effect, but appellant refused to pay the amount named therein to the beneficiary. This suit followed and resulted in a judgment against appellant, from which the present appeal was taken.

During the trial four exceptions were reserved by appellant, the first three of which relate to rulings upon evidence, while the fourth was taken to rulings upon the prayers.

Mrs. Baker signed the application for insurance on September 21st, 1936, at her home, after she had been solicited several times by an agent of the appellant. On October 26th, 1936, she was examined by Dr. J. C. Coby, medical examiner for the appellant. The examination disclosed no organic disease and she was rated as a first class risk by the doctor. The policy was thereupon issued

by the company in due course and delivered to the insured at her home in Pocahontas, Somerset County, Pennsylvania, at which time the premium was paid. By its terms the application signed by assured was made a part of the contract and attached to the policy, and assured's declarations to the medical examiner were a part of her application. Mrs. Baker signed her name beneath those declarations, included among which appear the following questions:

4e. "Have you ever applied for or received any disability benefit under any life, accident or health policy, fraternal insurance membership, or Workmen's Compensation provision, or any pension or allowance, government, or otherwise?"

9a. "Have you consulted, or been attended by a physician during the past three years? Give dates, complaints, doctor's names and address."

10a. "Have you ever had palpitation of the heart, shortness of breath, pain in chest or heart disease?"

Appellant insists that the answer to each of those questions, as written down by the medical examiner after talking with Mrs. Baker, was "no," but from the photostatic reproductions of those answers which are contained in the record, it is impossible, even upon a close inspection of them, to conclude that such answers are intelligible, since they are nothing more than scrolls, characters or symbols. Certainly they would make sense if translated "no," but a person, however intelligent, could not be charged with knowledge that they meant "no" upon looking at them. They are not unlike characters and symbols used by stenographers and certainly are as meaningless to a layman as if actually written in shorthand.

At the time the policy was issued Mrs. Baker lived upon a farm with her husband, Clyde Baker, at the home of her mother, Mrs. Carrie H. Shumaker, and her duties consisted of housework, attending the gasoline station, looking after chickens, and helping in the fields in haytime. She had been known to suffer no illness of any

kind, except for aproximately two months in the early part of the year 1936, when she consulted Dr. W. Oliver McLane, complaining of rapid beating of her heart. Dr. McLane prescribed a digitalis medication to which she proved sensitive, breaking out in a digitalis rash. The doctor discontinued use of that drug and put her on a medication of iodize, under which her condition cleared up and she was discharged as well. While being treated by Dr. McLane, she was a member of a fraternal organization known as the Daughters of America, and Dr. McLane, while she was under his care, gave several certificates to that effect, which were by Mrs. Baker presented to the Daughters of America at Frostburg in order to enable them to pay her certain disability benefits, to which by reason of her membership in that organization she had become entitled, and she received from the Order at least eight weeks' sick benefit payments at the rate of three dollars per week. It may be added that Dr. McLane did not at any time diagnose her ailment as heart disease, but concluded she had "nervous heart trouble," which was regarded by him as a trivial ailment or functional disorder as distinguished from an organic disorder.

Mrs. Shumaker, the mother of Mrs. Baker, was present when the latter was examined by Dr. Coby, appellant's medical examiner. She testified over objection that, in response to Question 4e, propounded by the medical examiner, her daughter informed Dr. Coby she had received benefits from the Daughters of America when under the care of Dr. McLane. The witness was first asked if she recalled the answer which her daughter gave to Dr. Coby in response to Question 4e, and to the allowance of that question the first exception was reserved. The question did not call for a statement as to what her daughter said, but simply sought information as to whether she recalled the answer, and on any theory of the case, the allowance of the question cannot be characterized as improper or erroneous. Moreover, assuming that it was improper, the answer being simply to the

effect that she recalled what her daughter had said, it could not be regarded in any sense as injurious to appellant. The second exception was taken to the court's action in permitting her to state what the daughter told Dr. Coby in answer to Question 4e of the declarations made to the medical examiner. No error is perceived in this ruling, for if the jurors believed the statement of Mrs. Shumaker, they could further find that Mrs. Baker was answering the question truthfully and honestly, and had no intention of suppressing any material fact from Dr. Coby or the appellant.

Dr. McLane was asked to state the nature of the disability which Mrs. Baker suffered at the time he gave the certificates for her to use in drawing sick benefits from the Daughters of America. An objection to that question was overruled, and the third exception noted. His reply was that her disability was due to a drug rash that had been produced by him in prescribing digitalis. The inquiry was material, since it tended to show, not only that Mrs. Baker endeavored honestly and in good faith to answer the questions truthfully, but as well to show that she had in the past suffered from no illnesses which she had failed to disclose to the medical examiner. No error is found in the ruling.

Dr. Colby, the medical examiner, admitted he was informed by Mrs. Baker that she had consulted Dr. McLane, but denied she told him she had received any sick benefits or been treated for shortness of breath. He appeared very uncertain in his testimony and showed a poor recollection of what the applicant had actually told him, but it is a fair inference that, after propounding the questions to Mrs. Baker and receiving the answers thereto, he proceeded, from the information given him and from his physical examination of Mrs. Baker, to make his own deductions as to the facts and record the answers in accordance therewith. He admitted having discussed the matter with Dr. McLane as a result of her disclosure that she had been treated by the latter, and stated that after talking with Dr. McLane he still regarded her ail-

ment as a trivial matter and further testified that had applicant been suffering from an organic disease at the time of his examination he would have discovered it.

This brings us to a consideration of the prayers. Appellee offered three, all of which were granted, but no special objection is made to them, if in fact the case was properly submitted to the jury. Of eight prayers offered by the defendant, those numbered A, B, C, D, E and F, were refused, while its first and second were granted. The A prayer sought a directed verdict upon the ground that the evidence was legally insufficient to entitle the plaintiff to recover. Its B prayer sought a binding instruction in favor of the defendant upon the ground that "under the pleadings and evidence" in the case there was no legally sufficient evidence to entitle the plaintiff to recover. Its C prayer was more specific and asserted that in her application for the policy sued upon Mrs. Baker made or permitted to be made on her behalf untruthful answers to material questions in the medical examiner's report forming a part of her application for insurance; that such answers constituted false representations as to matters material to the risk which by her application she asked the defendant to assume, and their verdict must be for the defendant.

Its D and E prayers were similar, except that by the former the false and untrue answers allegedly made by Mrs. Baker were confined to Questions 4e and 9a, while in the latter they were confined to Questions 9a and 10a.

It will be observed that instructions A, C, D, E and F are all in effect demurrers to the evidence, prayers C to F, inclusive, specifying the grounds relied upon as disentitling appellee to have the case submitted to the jury. In support of its contention that the trial court erred in their refusal, appellant asserts that since the policy here sued upon was applied for in the State of Pennsylvania, delivered to Mrs. Baker in that state, where the premium due thereon was paid, it was, therefore a contract made under the laws of that state, and its construction is controlled by such laws; that tested thereby, the demurrer

prayers were improperly refused. Conceding for the sake of argument the soundness of that reasoning, the problem which inevitably arises is how are the courts of Maryland to know the law of Pennsylvania, for it must be known in order to be applied?

In 1 *Couch on Insurance,* sec. 193, page 430, it is stated:

"There is considerable diversity of conclusion among the decisions, and some conflict of authority as to the law which should govern the construction of contracts of insurance with respect to their validity, including the capacity of the parties to contract, the execution of the policies, and the rights and obligations created thereby. Perhaps the most generally accepted rule is that an insurance contract is governed by the law and usages of the place where it is made; but there are also decisions to the effect that the respective contracts considered were governed by the law of the place where they were countersigned. or delivered, or accepted, or even by the domicil of the insurer. Then, again, the question is sometimes controlled, or at least materially affected, by express contract provision or statutory regulation. And, of course, the language used in the policies, although not expressly determinative, often so influences the conclusions reached that, although they are diverse, they are not necessarily conflicting with respect to the principles ordinarily applied, or to be applied. These, and various other questions which have arisen in connection with the subject under discussion, are discussed in detail in the immediately following sections of this work.

"It should also be remembered that there is no presumption as to the place where a contract of insurance is made or is to be performed, so that, if the law of a foreign state is invoked, it, like any other fact, must be proved."

That authority is in full accord with pronouncements of this court upon the subject, for in *Universal Credit Co. v. Marks,* 164 Md. 130, 131, 163 A. 810, 814, is was said: "The law of Maryland, however, is *prima facie* the law to be applied, and, if the seller or its assignee wishes

the benefit of the law of another jurisdiction, the burden is on it to prove the foreign law."

By chapter 131, Acts 1939, our Legislature repealed section 95A of Code, article 75, and section 231A of Code, article 16, and in lieu thereof added to article 35 seven additional sections numbered 50A to 50G, inclusive. The enactment is commonly known as "The Uniform Judicial Notice of Foreign Law Act." By section 50A, courts of this state are required to take judicial notice of the common law and statutes of every state, territory and other jurisdiction of the United States and of every other jurisdiction having a system of law based upon the common law of England. The next section, 50B, deals with the method by which our courts are to obtain information as to such foreign laws, while 50C prescribes that the determination of such foreign laws shall be made by the court and shall be reviewable; that trial courts shall grant instructions to juries applying such foreign laws. Subsequent provisions, 50D, provide (a) that any party to the trial may offer evidence of such foreign law, but before he may do so, or may ask the Maryland court to take judicial notice thereof, reasonable notice must be given the adverse parties in the pleadings or otherwise of such intention to rely upon the foreign law. It is provided by section 50E that the law of a jurisdiction other than those referred to in 50A shall be an issue for the court, but shall not be subject to the stated provisions concerning judicial notice.

It thus appears that by the enactment of chapter 131, Acts of 1939, the Legislature intended to provide a simple, effective and expedient method to enable courts of Maryland to ascertain the law of other states and territories of the United States and of other jurisdictions having a system of law based upon the common law of England, but in order for a litigant to invoke the benefits of such foreign law it required (section 50D) that he give reasonable notice in the pleadings or otherwise to the adverse party of his intention so to do, such notice being a prerequisite to offering proof of such foreign law or asking

the court to take judicial notice thereof. In the present case, the question of what constitutes reasonable notice under the statute does not arise, for the reason that the record is entirely devoid of anything tending to show that the privileges accorded by the statute were invoked by appellant, and this we cannot assume.

It follows from what we have said that the rights of the parties in the present case must be determined by the law of Maryland.

In this determination, it is unnecessary again to review the evidence in detail, which, however, if believed by the jurors, would have enabled them to find, (a) that Mrs. Baker in her application for insurance, including her answers to the medical examiner, made truthful disclosures in answers to all questions; (b) that she was in fact in good health at that time; (c) that if the medical examiner had incorrectly recorded her answers to the questions under consideration, she, because of illegible characters used by him for that purpose, could not thereby be apprised that the answers she had given him had been misquoted. In this respect the facts differ materially from those considered by this court in *Commercial Casualty Ins. Co. v. Schmidt,* 166 Md. 562, 563, 171 A. 725; and *Metropolitan Life Ins. Co. v. Samis,* 172 Md. 517, 192 A. 335. See also *Metropolitan Life Ins. Co. v. Alterovitz,* 214 Ind. 186, 14 N. E. 2nd 570, 117 *A. L. R.* 770, beginning at page 790; and 4 *Couch on Insurance,* section 842, pages 2775, 2776. In the authority last cited, it is stated: "* * * So, where questions as to material matters are propounded to the applicant by the insurer's solicitor, and are truthfully answered, but such solicitor sets down answers, not as given by the applicant, but in his own way, the insured, if free from fault, is not bound by the answers as recorded. And, in answering the questions of the medical examiner, the applicant may rely upon his construction of them at the time, and may answer them in the light of such interpretation. In fact, a medical examiner's construction of the answers of the applicant concerning matters of which the former must

be deemed to have a special technical knowledge, including statements and terms which it is his duty to construe, binds the insurer, where the answers are written by such agent in accordance with such construction. It would seem, however, that this rule should be qualified to the extent that good faith is required of the insured, and that he shall not knowingly make false answers as to facts upon which the medical examiner may base his conclusions."

In *Schloss v. Metropolitan Life Ins. Co.,* 177 Md. 191, 9 A. 2nd 244, the latest related case to that before us, it was said: "On the other hand, numerous cases are found in the reports of this court in which is laid down the principle that an untrue statement made in an application for insurance does not void the policy unless such statement was not made in good faith by the applicant, or is related to some matter material to the risk." After giving illustrations of cases within that principle, it is further stated: "A careful examination of the last three cases to which reference has been made will reveal the fact that in all of them the answers to the respective questions bear no evidence of *mala fides* on the part of the applicants * * *."

In view of the nature of the testimony in the present case, to which reference has been made, it must be held that the truth and falsity of Mrs. Baker's answers to the questions propounded by the medical examiner were matters for the jury to resolve and the trial court properly rejected the demurrer prayers.

Appellant's B prayer, for the reasons assigned, was bad as a demurrer prayer. It is likewise bad as a variance prayer, since it wholly fails to point out any variance between the allegations and proof. Its rejection was therefore proper. Code, art. 5, sec. 11; *Washington Rwy. & Elec. Co. v. Anderson,* 168 Md. 224, 225, 177 A. 282; *Roycroft v. Nellis,* 171 Md. 136, 188 A. 20, and cases there cited.

It appearing from the record that, by the granted prayers offered by the parties, the case was submitted to

the jury in the most favorable light in which appellant was entitled to have it considered, the judgment appealed from must be affirmed.

*Judgment affirmed, with costs.*