## LILLY CLIFF vs. FRANCIS A. PINTO.

AUGUST 5, 1948.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

BAKER, J. This is an action of assumpsit for breach of promise of marriage. It was heard by a justice of the superior court sitting without a jury and he rendered a decision awarding the plaintiff damages of $2500. The defendant duly prosecuted his bill of exceptions to this court and he is now relying on his sixth and seventh exceptions only. His other exceptions not being briefed or argued are deemed to be waived.

It appears from the evidence that the parties first met on May 9, 1945 at Blackpool, Lancashire, England. The plaintiff was a member of the women's auxiliary territorial service of the British army. The defendant was a staff sergeant in the United States army air force and was stationed at Walton near Blackpool. The plaintiff invited the defendant to her home where he met her family. He subsequently visited her there almost every evening and often was an overnight guest. After a brief courtship they discussed marriage, the plaintiff apparently being the first to broach the subject. The defendant promised to marry her but not while he was in uniform.

On August 3, 1945 the defendant left England for France. Thereafter the parties corresponded regularly and frequently. The plaintiff kept a diary and also a complete record of the letters they both wrote. By arrangement between them each letter was numbered. The defendant did not return to England but arrived in this country November 8, 1945 and was soon separated from the service and re-

turned to his home in Jamestown in this state. On November 14 he wrote the plaintiff a letter formally asking her to marry him. She accepted this offer in a letter to him dated November 19, 1945 and mailed in England, she in the meantime having also been demobilized. The parties continued to correspond frequently and the defendant asked the plaintiff to come to this country so that they could be married. In compliance with immigration regulations, under date of January 5, 1946 he signed a so-called affidavit of support stating his financial condition. In this instrument he referred to her as "my fiancee" and declared that he would marry her immediately upon her arrival in this country. The plaintiff had difficulty in obtaining passage but eventually she succeeded in doing so, paying her own expenses and giving up a position as a silk weaver.

She arrived in New York November 11, 1946 and was met at the boat by the defendant and his two married sisters who lived in Brooklyn. She was taken to the home of one of the sisters where both parties stayed until November 16 in order to attend the funeral of a relative of the defendant. On November 12 they were given a blood test by a physician and each received a certificate showing a condition satisfactory for marriage. On the same date they also consulted a priest at a Roman Catholic Church in Brooklyn in order to make arrangements for their wedding, the defendant being a member of that faith and the plaintiff being a Protestant. The priest, however, told them in substance that before he could marry them they should furnish an affidavit signed by her mother to the effect that the plaintiff had not been married before. The defendant then suggested to the plaintiff that he would see what could be done in Jamestown about their wedding. While in Brooklyn he purchased a wedding ring from his brother-in-law who was in the jewelry business.

On November 16, 1946 the defendant took the plaintiff to his home in Jamestown where she met his father, his mother, who was elderly and not well, and his brother

and other sisters. The next day they consulted the parish priest at the Catholic Church in that town regarding their marriage, and on three occasions, namely, November 18, 20 and 25, the plaintiff received instructions in that faith concerning their wedding. The priest also requested them to produce their baptismal records. The plaintiff did so but the defendant's record had apparently been lost. He had been baptized at a church in Newport and it was necessary to obtain from the priest in charge thereof an affidavit of that fact. Although an affidavit was made out the defendant never obtained it. The plaintiff, however, went to Newport on November 30 and received it, but it was not delivered to the priest in Jamestown.

The plaintiff remained at the defendant's home apparently on good terms with his family until December 1, 1946. On that date he told her that she would have to leave and that he would take her to his sister in Brooklyn. The only reason he gave was that his mother could stand her no longer. When she asked him about the marriage he said it would have to wait. The defendant and plaintiff remained in Brooklyn until December 6 when he returned to Jamestown alone. He visited her again at his sister's home from January 14 through January 17, 1947, and there was some correspondence between the parties after this occasion. The defendant testified that on this last trip to Brooklyn he told the plaintiff that it was all over and there would be no marriage. The plaintiff, on the other hand, testified that during all this period he merely told her to wait.

On February 4, 1947 she left Brooklyn and went to Pawtucket in this state to visit a woman whose niece she had known in England. She remained with this woman until after the trial of the case in the superior court. On February 6 by agreement the plaintiff met and talked with the defendant in Newport and when she asked him about the marriage he again told her to wait. On March 5, 1947 at the suggestion of her attorney she, accompanied

by the woman with whom she was living in Pawtucket, went to Jamestown and called on the defendant in order to get a final answer on the marriage question. At that time he definitely told her that he could not go through with it.

The defendant does not question the fact that he and plaintiff were duly engaged. However, in support of the exceptions relied on he contends: first, that it was a condition of the promise of marriage that the plaintiff would embrace the Catholic faith and that her failure to do so is a defense to this action; and, second, that as the marriage was to have been performed in New York City and the breach of contract occurred there, the breach did not support a right of action in that state where an action of such nature has been abolished by statute, and therefore there was no right of action in this state.

We have examined the evidence in order to determine whether or not the defendant's first contention is correct. In giving his decision the trial justice stated that he was "not at all impressed by the story of the defendant." After careful consideration we are of the opinion that defendant's contention is not correct and that he did not prove that the promise of marriage was made on the condition above referred to. The defendant testified in substance that in England he and the plaintiff discussed their future and that she then said she would become a Catholic. He did not say when this was to take place and did not state that her conversion was a condition to their marriage. His only reference to any condition was that he would not marry while in uniform. The plaintiff, on the other hand, testified in effect that she was planning to become a Catholic, but that their marriage was not conditioned on her so doing.

The evidence and especially the conduct of the parties themselves support the plaintiff's position that their wedding did not depend upon the carrying out of the aforesaid alleged condition. In such of the correspondence be-

tween them as was introduced in evidence there is no reference whatever to the plaintiff's becoming a Catholic. At no time prior to trial did the defendant state to her or to anyone else that his refusal to marry her was because she had not become a Catholic. As already pointed out the parties attempted to marry the day after the plaintiff landed in New York, and a few days thereafter also took the matter up with the parish priest in Jamestown, from whom the plaintiff received the necessary instructions. The defendant admitted in his testimony that the plaintiff never refused to be married in the Catholic Church. The evidence shows that during the short time available to her the plaintiff acted reasonably expeditiously in the matter of changing her faith.

Apart from some possible friction between the plaintiff and the defendant's mother, the real reason why he declined to proceed with the marriage appears from his testimony in cross-examination as follows: "Q. Didn't you testify in direct examination that you had lost all affection for this girl and that was the reason why you weren't going through with it? A. That was one of the reasons. Q. That you had lost all your love for her? A. Oh, yes, that is the reason. Naturally it would be silly to get married to her if I didn't love her. Q. And that is the reason why you don't want to marry her today, isn't it? A. That is right, sir." We find, therefore, that the defendant's exception which raises the question of the existence of such an alleged condition in the agreement to marry is without merit.

In support of his second contention the defendant argues in substance that this action cannot properly be maintained in this state, because the contract is governed by the law of New York which does not allow an action of this nature to be brought. At the trial of the case in the superior court the defendant, however, offered no evidence whatever tending to prove the pertinent law of that state. He takes the position that, by reason of the

provisions of P. L. 1940, chap. 939, he is not required to present such evidence, since in the circumstances and under such chapter this court is required to take judicial notice of the New York law. The first two sections of chap. 939, *supra,* read as follows: "Section 1. *Judicial Notice.* Every court of this state shall take judicial notice of the common law and statutes of every state, territory and other jurisdiction of the United States. Sec. 2. *Information of the court.* The court may inform itself of such laws in such manner as it may deem proper, and the court may call upon counsel to aid it in obtaining such information."

In reply to the defendant's position the plaintiff, however, calls our attention to sec. 4 of that chapter which provides: *"Evidence as to Laws of Other Jurisdictions.* Any party may also present to the trial court any admissible evidence of such laws, but, to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken thereof, reasonable notice shall be given to the adverse parties either in the pleadings or otherwise." She contends that no reasonable notice concerning the New York law was given her either in the pleadings of the case or otherwise and, therefore, that this court is not bound under secs. 1 and 2 to take judicial notice of the pertinent law of that state.

Chapter 939, *supra,* is known as the Uniform Judicial Notice of Foreign Law Act. As such it has been adopted and made law by legislative action in a large number of states. In some of them it has been before the court of last resort on various questions of interpretation including the question of the necessity of notice to the adverse party as provided for in sec. 4 hereinbefore set out. The object of the act undoubtedly was to provide a simple method of enabling the courts of the forum to ascertain the law of every state, territory and other jurisdiction of the United States. But as was said in *Prudential Ins. Co. of America* v. *Shumaker,* 178 Md. 189: "* * * in order for

a litigant to invoke the benefits of such foreign law it (the statute) required * * * that he give reasonable notice in the pleadings or otherwise to the adverse party of his intention so to do, such notice being a prerequisite to offering proof of such foreign law or asking the court to take judicial notice thereof." Such has been the holding generally when this question has been raised. *Maccabees* v. *Lipps,* 182 Md. 190; *Fardy* v. *Mayerstein,* 221 Ind. 339. See also *Lennon* v. *Cohen,* 264 Mass. 414; *Corbett* v. *Terminal R. R. Ass'n,* 336 Mo. 972.

In the instant case the record shows that the defendant did not give the plaintiff reasonable notice in the pleadings or otherwise that he was relying on the law of New York by way of defense and desired to offer proof of such law or was asking the court to take judicial notice thereof. The transcript shows that no reference was made to the law of New York until after all the evidence was in and the defendant's attorney had begun his argument to the court. In such circumstances it is our opinion that the defendant failed entirely to comply with the provisions of sec. 4; chap. 939, *supra;* that he cannot now rely on the law of New York; and that as the law of that state is not properly before this court, the instant proceeding is governed by the law of this state, that is, the law of the forum. Under such law an action of the present kind can lawfully be maintained.

The defendant has also cited to us G. L. 1938, chap. 510, §5. We have examined that section and we are of the opinion that it has no bearing on the questions before the court in the instant case. Defendant's seventh exception is overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for the entry of judgment for the plaintiff on the decision.

*Woolley, Blais & Quinn, Clarence N. Woolley, Corcoran, Foley & Flynn, Francis R. Foley,* for plaintiff.

*Letts & Quinn, Daniel J. Murray,* for defendant.