## HOGAN *v.* Q. T. CORPORATION

[No. 58, September Term, 1962.]

*Decided November 16, 1962.*

The cause was argued before Henderson, Hammond, Prescott, Horney and Marbury, JJ.

*Lansdale G. Sasscer, Jr.,* with whom were *Sasscer, Clagett & Powers* on the brief, for appellant.

*Cary M. Euwer,* with whom were *Mitchell, Clagett & Euwer* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

In this action by a broker for commissions claimed to have been earned in bringing about the lease of a store property in or near the Queenstown Shopping Center in Prince George's County to the Southland Corporation for a "Seven-Eleven Store," the jury rendered a verdict for the broker (Earl V. Hogan) against the owner of the leased property (Q. T. Corporation). But the lower court granted the motion of the owner for judgment *n.o.v.,* and entered a judgment in its favor against the broker. And the broker appealed.

On appeal, the only question presented by the broker is whether there was sufficient evidence for the jury to find that he was acting for the owner and hence entitled to commissions. On the other hand, the owner, claiming that the applicable law was that of the District of Columbia, contends that under that law, the broker failed to establish a *prima facie* case.

In October of 1958 the broker telephoned the attorney for the owner corporation at the office of the attorney in Washington, D. C., and told him his name and that he was a real estate broker. He further told the attorney he had been in touch with a Texas "firm" that wanted to establish a chain of stores in the Washington area and that he would like the prospect to consider an unimproved part of the shopping center as a location. The broker further informed the attorney of the amount of rent usually paid by the prospective purchaser or lessee and as to the terms of the leases and options it usually entered into. And, according to the broker, the attorney advised him that the owner would not be interested in selling the property but would allow the broker to try to interest his prospect in a store to be built and leased to it. But, according to the attorney, the broker told him that he was scouting for locations for Seven-Eleven Stores; the broker did not say that he was seeking employment by the owner corporation; and he (as attorney

for the corporation) never requested the services of the broker.

The broker promptly contacted a representative of Southland and, having ascertained that it was interested in leasing the property, went to the office of the attorney and conferred with him in person. After further discussing the details of the lease, a form of lease used by Southland was left with the attorney, together with a business card showing that the broker was a "real estate and business chance broker," but the attorney claimed that the card was not given to him until long after the lease had been executed. On this occasion, according to the broker, he informed the attorney that he had other properties he could offer the prospective lessee, and the attorney agreed that he could offer the store building for lease to be occupied after it had been built.

About a week later, the broker arranged for another meeting in the office of the attorney at which the officers and directors of the owner corporation were to be present. On this occasion, the broker brought a representative of Southland with him to the meeting and, acting as a go-between, explained that he was a real estate broker and was there for the purpose of introducing the representative of the prospective lessee to the directors and officers. At that meeting, the parties agreed on a form of lease and the notes taken by the representative of Southland were submitted to the attorney for the lessee corporation for the purpose of preparing a lease. According to the representative of the lessee, the purpose of this meeting was to "discuss the possibility of a lease" of property that the broker "had shown us" after the broker "had previously spoken with" the attorney for the owner corporation. But, according to the attorney for the owner corporation and some of its directors or officers, the broker did not make a statement at this meeting as to "whom he was representing in connection with the leasing." The attorney also stated that the broker took no part in the negotiations concerning the lease. The attorney admitted, however, that he knew the broker did not have authority to bind the lessee corporation. According to the broker, he continued to act as a go-between with respect to the wording of the lease at the request of the attorney for the owner corporation while the lease was being prepared. After the

lease had been prepared it was executed by the lessee in Texas and by the lessor in Washington, D.C., where all of the negotiations with respect to it took place.

The attorney for the owner corporation never asked the broker for whom he was working, and the broker, because he had told "them" that he was in the brokerage business and because he "understood they knew what a real estate broker was," did not seek payment of commissions until after the leased premises were accepted by the lessee. At that time, according to the attorney for the owner corporation, the broker telephoned and inquired "whether he had been counted in for a commission." And it was not until some eight months after the lessee corporation began making payments under the terms of the lease that a demand was made for the customary commissions. Payment was refused and this action was brought.

At the trial it was stipulated that the owner corporation had received rent and its percentage of the sales aggregating $11,151 over a period of twenty-seven months before the day of trial. The verdict of the jury was for $278.77.

It is conceded that the owner failed to give the broker notice either in the pleadings or otherwise of its intention,— pursuant to the provisions of Code (1957), Art. 35, § 50,—to offer evidence of, or to ask that judicial notice be taken of, the law of the District of Columbia as the applicable law of the case.

Considering the claim of the appellee ahead of that of the appellant, it is apparent that the question as to what law is applicable to the facts of the case is not properly before us. At the trial the owner attempted to raise the question by a motion for a directed verdict based on the theory that under the law of the District of Columbia that broker had not made out a case, but the motion was overruled. The owner also requested the court to instruct the jury that the law of the District should be applied, but the court refused to do so. Apparently the claim on appeal is that the broker had waived the notice required by the statute because the broker did not object to the application of the law of the District and seemed to contend that it was the same as that of Maryland. The contention lacks substance. While the record does not disclose, one way or the

other, whether the broker actually objected or contended that the law was the same in both jurisdictions, there is nothing in this case to indicate, as there was in *Joffre v. Canada Dry, Inc.,* 222 Md. 1, 158 A. 2d 631 (1960), that the parties had assumed that the law of the District was controlling. And while the trial judge seemed to be uncertain as to what law controlled, he clearly did not assume at the trial of the case that the law of the District was applicable. Under the circumstances, since the owner failed to give the notice required by the statute, this case must be determined according to the law of the forum without regard to any conflict that may exist between the law of the District and that of this State. See *Alexander v. Hergenroeder,* 215 Md. 326, 138 A. 2d 366 (1958). See also *Prudential Ins. Co. v. Shumaker,* 178 Md. 189, 12 A. 2d 618 (1940), and *Maccabees v. Lipps,* 182 Md. 190, 34 A. 2d 424 (1943).

On the question of the appellant as to whether the lower court was right or wrong in granting the motion for a judgment *n.o.v.,* we think the court erred in so doing.

In deciding whether to grant a motion for a judgment *n.o.v.,* the court should resolve all conflicts in the evidence in favor of the plaintiff and assume the truth of all evidence and such inferences as may reasonably be deduced therefrom which tend to support the right of the plaintiff to recover. *Baliles v. Bryant,* 207 Md. 332, 114 A. 2d 601 (1955) ; *Beck v. Baltimore Transit Co.,* 190 Md. 506, 58 A. 2d 909 (1948).

The pertinent provisions of Code (1957), Art. 2, § 17, state that when a real estate broker employed to lease real estate procures a lessee acceptable to the employer, the broker is deemed to have earned the customary commission. In such case the employment may be implied from the conduct of the parties and need not be supported by evidence of a written or even an explicit oral agreement. *Leimbach v. Nicholson,* 219 Md. 440, 149 A. 2d 411 (1959). But the general rule is that the right of a broker to recover compensation for services rendered depends on a showing (in addition to establishing he was the procuring cause of the lease or sale) that he was either employed by the owner, or, if he acted without prior authority, that his acts were subsequently ratified. See *Snedker v. Balti-*

*more Brick Co.,* 198 Md. 499, 84 A. 2d 868 (1951). And cf. *Rogers v. Garrigues,* 185 Md. 544, 45 A. 2d 277 (1946). The only question then in this case, where ratification is not an issue and it is not disputed that the broker was the procuring cause, is whether the owner employed the broker to lease the property.

In *Heslop v. Dieudonne,* 209 Md. 201, 120 A. 2d 669 (1956), in which there was no contract or express oral agreement of employment of the broker by the owner but it was claimed that there was conduct from which it could be found that a relationship of principal and agent existed between the parties, it was said (at p. 206) that:

> "When the [broker] requested permission to show the property of the [owners] to prospective purchasers, both parties obviously realized the type of relationship which was being created between them. There was a desire by the [owners] to sell the property, and by allowing the [broker] to show the property to various people, they impliedly contracted to use the [broker] as an agent for the purpose of that sale."

As that case and the cases therein cited show, the existence of a principal-agent relationship is ordinarily a question of fact.

There is little, if any, distinction between the *Heslop* case and this. For in the case at bar, although the testimony was conflicting, there was evidence from which the jury could find that the owner had allowed the broker to endeavor to kindle the interest of the prospect and subsequently agreed that the broker could offer the prospective lessee a store to be built and leased to it. There was also evidence from which it could be further found that the owner (by acting as it did) should have realized that a principal and agent relationship was created between itself and the broker. And since such relationship may be implied from the words and conduct of the parties and the surrounding circumstances, the question was properly submitted to the jury, and its verdict should not have been set aside.

Applying the stated rules to the facts of this case, we think the evidence was legally sufficient to support the finding of the

jury that the broker was acting for the owner and therefore had a right to commissions. Clearly the evidence was not so slight and inconclusive that it would not permit a reasonable inference that the broker was the agent of the owner. This being so, the court was in error when it granted the motion for judgment *n.o.v.*, and the verdict of the jury should be reinstated.

> *Judgment n.o.v. vacated and judgment entered for Earl V. Hogan against Q. T. Corporation for $278.77, with interest from November 14, 1961; costs below and in this court to be paid by appellee.*