In re **MERRY–GO–ROUND ENTERPRISES, INC., MGR Distribution Corporation MGRR, Inc. and Alameda Chess King, Inc., et al., Debtors.**

**The Binswanger Companies, Plaintiff,**

v.

**Merry–Go–Round Enterprises, Inc., MGR Distribution Corporation, and MGRR, Inc.,**

and

**Deborah Hunt Devan, Trustee, and Keen Realty Consultants, Inc., Defendants.**

**Bankruptcy Nos. 94–5–0161–SD to 94–5–0163–SD, 94–5–3774–SD. Adversary No. 96–5448–SD.**

United States Bankruptcy Court, D. Maryland, at Baltimore.

Feb. 23, 1999.

Cynthia L. Leppert, Neuberger, Quinn, Gielen, Rubin & Gibber, Baltimore, Maryland, for Chapter 7 Trustee.

Paul R. Rosen, Leslie B. Baskin, Spector, Gadon & Rosen, P.C., Philadelphia, Pennsylvania, for Binswanger Companies.

Howard Rubenstein, Adelberg, Rudow, Dorf, Hendler & Sameth, Baltimore, Maryland, for Keen Realty Consultants, Inc.

Karen H. Moore, Assistant U.S. Trustee, Office of the U.S. Trustee, Baltimore, Maryland, for U.S. Trustee.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

E. STEPHEN DERBY, Bankruptcy Judge.

### I. Introduction

Before the court is Plaintiff's Motion for Summary Judgment, Defendant's Opposition, and Plaintiff's Reply Brief. Plaintiff, The Binswanger Companies (Binswanger), having partially survived a motion to dismiss, *see* 218 B.R. 361 (Bankr.D.Md.1998), seeks summary judgment awarding it a six percent commission from the Chapter 7 Trustee (Trustee) for acting as the procuring broker in the sale of the Debtors' warehouse. Because there is a genuine issue of material fact, viz. whether Binswanger was the procuring cause of the sale, and because Binswanger has not shown that it is entitled to judgment as a matter of law, the court will deny its motion.

### II. Standard for Issuance of Summary Judgment

Pursuant to Fed.R.Civ.P. 56(c), made applicable by Bankruptcy Rule 7056, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving

party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A material fact is one that might affect the outcome of the suit, *see Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; and a genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. 2505.

## III. Facts

The court finds that there is no genuine issue as to the following facts. The May Department Stores Company (May) purchased the subject property from the Trustee in August, 1996 for $19 million. The terms of that sale did not require the Trustee to remove the warehouse's materials handling equipment, and the Trustee did not pay a commission to Binswanger.

Binswanger's agents introduced May to the availability of the subject property, supplied information to May about the subject property's features, and, in early January, 1996, showed the subject property to May. *See* deposition of Tim Meyer at 21–26, 33, Binswanger's Exhs. B, C, and D. The showing was conducted with the permission of officers of the debtor in possession (DIP). *See* letter from Frank Binswanger, Jr. to Isaac Kauffman dated January 5, 1996, Trustee's Exh. 13. Although Binswanger had no written agency agreement with the DIP, Binswanger was negotiating with the DIP when May sent its first offer for the subject property to Binswanger on February 27, 1996. *See* letter from May to Binswanger dated February 27, 1996, Trustee's Exh. 30. The terms of this offer called for a purchase price of $15 million and required the seller to remove the materials handling equipment. *Id.* On March 1, 1996, the court converted the Debtors' cases to Chapter 7. As of March 1, 1996, Binswanger had not entered into a written agency agreement with the DIP; the DIP had not applied for the court's approval to employ Binswanger; and Binswanger's employment had not been approved by the bankruptcy court pursuant to 11 U.S.C. § 327(a). The Trustee has also not applied for the court's approval to employ Binswanger.

May made a second offer for the subject property in late March, 1996. The terms of this offer called for a purchase price of $16.5 million and did not require removal of the materials handling equipment. *See* letter from May to Trustee dated March 25, 1996, Trustee's Exh. 32. Although May discussed the terms of this offer with Binswanger prior to submitting it, May sent the offer directly to the Trustee. *See* deposition of Tim Meyer at 103, Binswanger's Exh. MM. The Trustee rejected May's second offer, but later accepted May's offer of June 12, 1996, which resulted in the August, 1996 sale.

## IV. Discussion

■ Section 14–105 of the Annotated Code of Maryland, Real Property (1996 Repl. Vol.), provides:

> In absence of a special agreement to the contrary, if a real estate broker employed to sell ... an estate ... procures in good faith a purchaser ... and the person procured is accepted by the employer and enters into a valid, binding, and enforceable written contract, in terms acceptable to the employer, of a sale, purchase ... or other contract ... and the contract is accepted by the employer and signed by him, the broker is deemed to have earned the customary or agreed commission....

Md.Code Ann., Real Prop. § 14–105. Where a broker seeks to collect a commission under this statute. Maryland courts have interpreted its language as requiring the that the broker prove (a) that the broker was employed by the owner and (b) that the broker was the procuring cause of the sale. *See Sanders v. Devereux,* 231 Md. 224, 231, 189 A.2d 604, 608 (1963) (discussing Md.Code., Ann., Art. 2 § 17 (1957), the language of which is nearly identical to current § 14–105).

### A. Employment

■ A broker may prove his employment by reference to either an express agreement or one that is implied from the parties' conduct. *See Hogan v. Q.T. Corp.,* 230 Md. 69, 74, 185 A.2d 491, 494 (1962). The issue in

*Hogan* was whether the broker had produced evidence sufficient to support a jury's finding that the broker was employed by the owner. *Hogan* involved a broker who had approached the owner's attorney to inquire into the owner's interest in leasing or selling an unimproved portion of the owner's shopping center to a prospective lessee known only to the broker. The broker, attorney, owner, and lessee eventually met to discuss lease terms, and there was testimony that the broker did not take part in the lease negotiations. *See id.* at 72, 185 A.2d 491. The broker himself testified that his attendance at the meeting was for the purpose of introducing the lessee to the owners. *See id.* The lessee's representative testified that the broker had shown the property to the lessee after the broker's first contact with the attorney. *See id.* The owner and lessee later executed a lease, and the broker sought payment of a commission after the leased premises were accepted by the lessee. *See id.* at 74, 185 A.2d 491. In determining whether the evidence was sufficient to establish an employment relationship arising out of the parties' conduct, the court applied the following standard:

> 'When the [broker] requested permission to show the property of the [owners] to prospective purchasers, both parties obviously realized the type of relationship which [sic] was being created between them. There was a desire by the [owners] to sell the property, and by allowing the [broker] to show the property to various people they impliedly contracted to use the [broker] as an agent for the purpose of that sale.'

*Hogan,* 230 Md. at 75, 185 A.2d at 495 (quoting *Heslop v. Dieudonne,* 209 Md. at 206, 120 A.2d at 671, brackets other than "sic" in original).

Applying this standard, the court concluded:

> [A]lthough the testimony was conflicting, there was evidence from which the jury could find that the owner had allowed the broker to endeavor to kindle the interest of the prospect and subsequently agreed that the broker could offer the prospective lessee a store to be built and leased to it.

There was also evidence from which it could be further found that the owner (by acting as it did) should have realized that a principal and agent relationship was created between itself and the broker. And since such relationship may be implied from the words and conduct of the parties and the surrounding circumstances, the question was properly submitted to the jury, and its verdict should not have been set aside.

*Hogan,* 230 Md. at 75, 185 A.2d at 495.

■ Under Maryland law, but subject to approval by the bankruptcy court which was never sought or obtained, Binswanger has advanced undisputed facts that establish the DIP's implied contract to employ Binswanger as an agent for the purpose of selling the subject property to May. There is no dispute that Binswanger introduced the buyer to the subject property, nor is there dispute that Binswanger showed the subject property to May with the DIP's permission for the purpose of arranging a sale. These facts are sufficient to establish Binswanger's implied employment relationship with the DIP. *See Hogan v. Q.T. Corp.,* 230 Md. 69, 185 A.2d 491 (1962).

■ The Chapter 7 Trustee's position is derived from that of the DIP. *See Ford Motor Credit v. Sherwood Ford, Inc. (In re Sherwood Ford, Inc.),* 125 B.R. 957, 961 (Bankr.D.Md.1991). Therefore, for the purposes of applying Md.Code Ann., Real Prop. § 14–105, Binswanger's implied employment relationship did not evanesce upon the appointment of the Chapter 7 Trustee with respect to May's February 27, 1999 $15,000,000 offer preconversion, again subject to bankruptcy court approval as required by 11 U.S.C. § 327.

## B. Procuring Cause

■ A broker who seeks to collect a commission under Md.Code Ann., Real Prop. § 14–105 must also prove that the broker was the procuring cause of the sale. *See Sanders v. Devereux,* 231 Md. 224, 231, 189 A.2d 604, 608 (1963). The standard for determining whether a broker is the procuring

cause of a sale of real estate is well settled in Maryland:

> In order for a broker to establish that he is the procuring cause of a sale of real estate, in the absence of a specific contract, the evidence must show or permit the inference that the sale was accomplished as the result of his action in discovering the purchaser, acquainting him with the property and referring him to the seller for further negotiations. ... Although it is not sufficient that the broker has merely planted the seed from which the harvest was reaped, ..., on the other hand the owner cannot take advantage of a broker's services and make the sale himself, or through another broker, so as to deprive the broker of his commission when he has introduced a prospective buyer to the seller and negotiations have progressed to a point where success seems imminent.

*Sanders*, 231 Md. at 231, 189 A.2d at 608 (citations omitted).

Whether a particular broker was the procuring cause of a particular sale often is accompanied by the issue of whether the owner rightfully terminated the broker's employment prior to the sale. In *Hill v. Iglehart*, 145 Md. 537, 125 A. 843 (1924), the Maryland Court of Appeals explained and applied the law regarding an owner's right to terminate his agent:

> The general rule is that the principal may at any time before the broker finds a purchaser ready, able, and willing to buy the property upon terms satisfactory to the principal revoke the agency ..., and that, where such revocation is untainted by fraud or bad faith, the broker will not be entitled to commissions, even though the principal, after the revocation, sells the property to a purchaser with whom the broker had been negotiating and notwithstanding that the broker's efforts may have been the direct and procuring cause of such sale.

*Hill*, 145 Md. at 550–51, 125 A. at 848. The broker in *Hill* attempted to recover a commission from an owner who sold property to Isaac Lycett. The court recognized that the broker was indeed the procuring cause of the sale to Lycett, but found that the owner had revoked the broker's agency prior to Lycett's becoming "ready, able, and willing to buy the property at a price satisfactory to the principal." *Hill*, 145 Md. at 551, 125 A. at 848. Commenting on the owner's revocation of the broker's authority, the court noted:

> [N]o fraud of bad faith can be imputed to [the owner] in connection with the revocation, in so far as it affected the right of [the broker] to commissions for a sale to Isaac Cate Lycett, for neither [the broker] nor [the owner] then knew that he thought of buying the property, and there is nothing in the record which [sic] positively discloses that he had formed an intention of purchasing it at that time.

*Hill*, 145 Md. at 551, 125 A. at 848.

*Leimbach v. Nicholson*, 219 Md. 440, 149 A.2d 411 (1959), also involved the issue of whether an owner's termination of a broker precluded the latter from collecting a commission. There, the Maryland Court of Appeals reversed a jury's verdict that the broker was entitled to a commission, holding that the broker had failed to prove that he was the procuring cause of the sale. *See Leimbach*, 219 Md. at 446, 149 A.2d at 414. In *Leimbach*, the broker, Nicholson, showed Leimbach's farm to the Ganns. The Ganns subsequently made three offers for the farm through Nicholson, the highest of which would allow Leimbach to realize $110,000 after Nicholson's commission. Leimbach rejected all of the Ganns' offers, but during the course of negotiations Leimbach informed Nicholson that he would consider an offer of $125,000. Unable to bring the parties together, Nicholson discontinued his efforts to sell the Leimbach farm to the Ganns in January, 1955. In July, 1955, however, the Ganns bought Leimbach's farm for $127,000, with Leimbach paying a $5000 commission to another broker, Strobel.

In holding that Nicholson was not the procuring cause of the sale to the Ganns, the court elaborated on the general rule that an owner's bad faith termination of a broker will not defeat the latter's right to a commission:

> [T]he term 'bad faith,' in this connection, imports a termination for the purpose of defrauding the broker, after his efforts have put the owner in a position to close

the sale on substantially the terms stated. If the broker has not met the conditions of his employment, the owner is not precluded from seeking other assistance by means of which a sale is ultimately effected on terms more favorable to him, even though to the same prospect introduced by the first broker.

*Leimbach,* 219 Md. at 448, 149 A.2d 411.

The court also discussed rules of inference for determining whether bad faith exists in an owner's termination of a broker:

> [A]n owner may not take advantage of a broker's services to secure a prospective purchaser and then deprive him of his commissions by selling directly to his client at a price less than the broker could sell under his authority, particularly where the authority is unrevoked.... In such a case the inference may be drawn that the broker was in fact the procuring cause, and that the owner's refusal to accept the offer submitted was a subterfuge to avoid payment of commissions [that] the broker had fairly earned. In the relatively few cases in which the sale has ultimately been made through other means at a higher price, and where there was no prospect of success when negotiations through the first broker terminated, it has been held that the dual inference, first, that the first broker was the procuring cause of the sale, and second, that the sale at a higher price was a subterfuge to defeat the first broker's right to commissions, does not arise.... The *Murphy* case suggests that the rule might not have been applicable if as the broker there contended but failed to show, the buyer was desirous of purchasing the property and was willing, even before the broker's efforts ceased, to pay the price which he subsequently did pay.

*Leimbach,* 219 Md. at 447, 149 A.2d 411 (citations omitted).

Applying the second rule of inference to the facts, the court held:

> [T]he circumstances of the instant case do not permit an inference that Nicholson had earned his commissions at the time his employment was terminated or abandoned, so as to preclude a sale at a higher price to Ganns ... without liability to Nicholson....

*Leimbach,* 219 Md. at 449, 149 A.2d 411.

Applying Maryland's law on procuring cause to the facts in this matter, Binswanger has not met its summary judgment burden of showing that there is no genuine issue of material fact as to whether it was the procuring cause of the sale. While Binswanger has set forth facts establishing his implied employment with the DIP, the Trustee's correspondence to Binswanger during March, 1996 establishes that such employment was revoked prior to the Trustee's selling the subject property to the May Company. *See* letters from Isaac Neuberger to Frank Binswanger, Jr. dated March 25 and April 22, 1996, Trustee's Exhs. 6 and 7. To establish its right to a commission, therefore, Binswanger must prove that the May Company was ready, willing, and able to buy the subject property at a price satisfactory to the Trustee at the time Binswanger's employment was terminated. See *Leimbach,* 219 Md. at 446–47, 149 A.2d 411 (holding that broker was not entitled to commission where broker did not produce a purchaser "ready and willing to buy at a price satisfactory to the owners"); *Sanders,* 231 Md. at 231–32, 189 A.2d 604 ("[T]he owner cannot take advantage of a broker's services and make the sale himself, or through another broker, so as to deprive the broker of his commission when he has introduced a prospective buyer to the seller and negotiations have progressed to a point where success seems imminent."). The deposition testimony of the May executive who was involved in the sale negotiations suggests that May was not ready and willing to pay $19 million for the subject property at the time of Binswanger's termination. *See* deposition of Tim Meyer at 47, Trustee's Exh. 1. Although a professional real estate buyer's testimony as to his willingness to increase his initial bid should normally be taken with a grain of salt, for purposes of summary judgment such testimony is to be taken as true. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Meyer's testimony thus raises a gen-

uine issue of material fact as to whether Binswanger was the procuring cause of the Trustee's sale of the subject property because it suggests that May was not ready and willing to buy at a price satisfactory to the Trustee at the time Binswanger was terminated.

### C. Binswanger's Compliance with Maryland's Article Governing Business, Occupations and Professions

■ The Trustee has further argued that Binswanger is precluded from collecting a commission by reason of Md.Code Ann., Bus. Occ. & Prof. § 17–516, which provides:

> A person may not bring an action or recover on an action for compensation for providing real estate brokerage services in a court of the State unless the person was authorized to provide real estate brokerage services under this title at the time of offering to provide and providing real estate brokerage services.

Md.Code Ann., Bus. Occ. & Prof. § 17–516 (1995 Repl.Vol.). A person, in this context, is defined to include "a firm, association, corporation, or other entity." *Id.* at § 1–101(f).

The plaintiff in this adversary proceeding is The Binswanger Companies, which is a fictitious name used by approximately 33 S corporations or LLCs. *See* deposition of Susan Sygenda at 6, Binswanger's Reply Exh. T. One such corporation is Binswanger of Maryland, Inc., which is licensed to do business in Maryland. David Binswanger, who holds a Maryland real estate broker license, is the broker of record for Binswanger of Maryland, Inc. *See* deposition of Susan Sygenda at 23, Binswanger's Reply Exh. U. The only individuals, however, who have been identified as having been involved on behalf of Binswanger in performing services on the May contract are Frank G. Binswanger, III, Frank G. Binswanger, Jr., Michael J. Treacy, and Jeffery J. Counsell.

Binswanger does not challenge the Trustee's exhibits 40, 41, and 42, which are certifications by the Executive Director of the Maryland Real Estate Commission stating that the Commission has no licensing history for Frank G. Binswanger, Jr., Michael J. Treacy, or Jeffery J. Counsell. Frank G. Binswanger, III testified by deposition that he was not licensed. Tr. Exh. 39, p. 26. Rather, Binswanger argues that David Binswanger's contractual relationship with such individuals, who were licensed in states other than Maryland, is consistent with Binswanger of Maryland, Inc.'s (and hence Binswanger's) recovery of a commission under Md.Code Ann., Real Prop. § 14–105. The issue, therefore, is whether Binswanger of Maryland, Inc., can recover a commission by the acts of individuals who were not licensed in Maryland but held licenses in other states and had some business relationship with a broker who was licensed in Maryland at the time the commission was allegedly earned.

Md.Code Ann., Bus. Occ. & Prof. § 17–320(a) provides:

> (a) In general.—(1) Subject to the provisions of this section, a licensed real estate broker may utilize as an independent contractor, employ, or otherwise contract with a licensed real estate salesperson or a licensed associate real estate broker to provide real estate brokerage services on behalf of the licensed real estate broker.
>
> (2) A real estate broker may not provide real estate brokerage real estate brokerage services through any other individual unless the individual is licensed as an associate real estate broker or real estate salesperson to provide real estate brokerage services on behalf of the real estate broker.

Md.Code Ann., Bus. Occ. & Prof. § 17–320(a). Binswanger urges the court to read § 17–320(a)(1)'s references to "licensed real estate salesperson" and "licensed associate real estate broker" as including individuals who are not licensed in Maryland but are licensed in other states. The statutory basis for this position, Binswanger suggests, is in §§ 17–101(h) and (j), which sets forth the following definitions:

> (h) Licensed associate real estate broker.—"Licensed associate real estate broker" means, *unless the context requires otherwise,* an associate real estate broker who is licensed by the Commission to provide real estate brokerage services on behalf of a licensed real estate broker with

whom the associate real estate broker is affiliated.

. . .

(j) Licensed real estate salesperson.—"Licensed real estate salesperson" means, *unless the context requires otherwise*, a real estate salesperson who is licensed by the Commission to provide real estate brokerage services on behalf of a licensed real estate broker with whom the real estate salesperson is affiliated.

Md.Code Ann., Bus. Occ. & Prof. § 17–101(h) and (j) (emphasis added).

Binswanger argues that the nature of interstate real estate transactions makes it unrealistic to expect salespersons to be licensed in all of the states where they perform real estate brokerage services. It is in the context of these types of transactions, Binswanger argues, that § 17–320(a) contemplates the provision of real estate brokerage services by individuals who are licensed in states other than Maryland and are supervised by a Maryland licensed real estate broker. *See* Binswanger's Reply at 8–9.

The court concludes from the plain meaning of the statute that § 17–320(a)(1)'s reference to "licensed real estate salesperson" and "licensed associate real estate broker" is limited to individuals who are licensed in Maryland pursuant to § 17–301 (requiring individuals to be licensed by the Maryland Real Estate Commission before providing real estate brokerage services in Maryland). Consequently, a holder of a Maryland real estate broker license may not recover a commission pursuant to Md.Code Ann., Real Prop. § 14–105 where his agents, in procuring the sale of real property, violated Md.Code Ann., Bus. Occ. & Prof. § 17–301. This principle is consistent with both the structure of the subtitle governing real estate broker licensing and Maryland case law applying § 17–516.

The subtitle governing real estate broker licensing addresses the situation of real estate professionals whose practice encompasses multiple states. Rather than dispensing with § 17–301's requirement that such individuals be licensed by the Maryland Real Estate Commission before providing real estate brokerage services, § 17–308 allows the Maryland Real Estate Commission to "waive any requirement of [the licensing] subtitle for a particular license for an applicant who holds a comparable or equivalent license granted by another state." Md.Code Ann., Bus. Occ. & Prof. § 17–308(a). Subsection (b) of § 17–308 provides:

(b) Conditions.—The Commission may grant a waiver under this section only if the applicant:

(1) pays the application fee required under § 17–307 of this subtitle for the license for which the applicant is applying;

(2) provides adequate evidence that the applicant meets the qualifications otherwise required by this subtitle for the license for which the applicant is applying;

(3) submits a certified copy of the applicant's license from the other state that is comparable or equivalent to the license for which the applicant is applying; and

(4) if the applicant holds a license comparable or equivalent to a real estate broker license, provides adequate evidence that the applicant actively maintains an office in the other state.

Md.Code Ann., Bus. Occ. & Prof. § 17–308(b). By providing a relatively painless procedure by which individuals who are licensed in other states can obtain a Maryland license, § 17–308 undercuts Binswanger's argument. *See also* Md.Code Ann., Bus. Occ. & Prof. §§ 17–513 (addressing the payment of fees to out-state licensed individuals who refer business to Maryland licensees) 17–604(b) (excepting fees paid under § 17–513 from the rule prohibiting the sharing of a commission with an individual who is not licensed in Maryland).

Maryland case law also supports this court's holding. In *Smirlock v. Potomac Development Corporation*, 235 Md. 195, 200 A.2d 922 (1964), the Maryland Court of Appeals held that an individual who was not licensed in Maryland at the time he provided real estate brokerage services was precluded from recovering a commission by reason of Md.Code Ann., Art. 56 § 228 (1957) (repealed) (predecessor to Md.Code Ann., Bus.

Occ. & Prof. § 17–516). Acknowledging that the individual was licensed in another state, the court refused to read an exception into the Maryland licensing statute. *See* 235 Md. at 199, 200 A.2d at 924. In so holding, the court remarked, "No reason is shown as to why the appellant did not avail himself of the reciprocity provisions of § 219, which seem very simple." Section 219(b) provided:

> (b) Recognition of foreign license.—In its discretion the Commission may recognize in lieu of statements required to accompany an application for a license, the license issued to a nonresident broker, or salesman in such other state, upon payment of the license fee and the filing by the applicant with the Commission of a certified copy of applicant's license issued by such other state.

Md.Code Ann., Art. 56 § 219(b) (1957) (repealed).

Although the facts in *Smirlock* are distinguishable from the matter *sub judice* in that the broker in *Smirlock* was not alleged to be under the supervision of a Maryland licensed real estate broker, this distinction is not material to the application of Maryland law. *See Glaser v. Shostack,* 213 Md. 383, 388, 131 A.2d 724, 726 (1957) (affirming award of a real estate commission to a principal while noting, in dicta, that a licensed principal may not recover a real estate commission on a contract made by his unlicensed agent).

For these reasons, Binswanger's motion for summary judgment will be denied on the alternative ground that the evidence does not suggest that Binswanger is entitled to a judgment as a matter of law.

Therefore, it is, this 22nd day of February, 1999, by the United States Bankruptcy Court for the District of Maryland,

ORDERED, that Plaintiff's Motion for Summary Judgment is denied.