**SIMON PROPERTIES, L.P.,**

v.

**Deborah H. DEVAN, et al.**

**No. JFM–00–984.**

United States District Court,
D. Maryland.

June 8, 2000.

## OPINION

MOTZ, Chief Judge.

This is an appeal from an order entered by the Bankruptcy Court granting a Motion To Approve Settlement Agreement, Or In The Alternative, To Compel Performance Under Settlement Agreement filed by Deborah H. Devan, the Chapter VII Trustee of the estates of Merry–Go–Round Enterprises and its affiliates ("MGRE"). The motion was directed to Simon Properties, L.P. ("Simon"), the landlord of certain properties that had been leased to MGRE. I find that an essential term of the settlement agreement (its approval by the Bankruptcy Court) had not been fulfilled before events overtook the purpose of the agreement and that the agreement never became effective. Accordingly, the decision of the Bankruptcy Court will be reversed.

### I.

MGRE filed Chapter 11 proceedings in January 1994. Approximately two years later, the Bankruptcy Court converted the Chapter 11 cases to Chapter 7 cases and appointed Deborah H. Devan as Trustee. The same day the Bankruptcy Court entered an order extending the time for the

Trustee to assume or reject MGRE's unexpired leases. Numerous landlords, including Simon, appealed this order to the District Court. The appeal was assigned to the Honorable Frederic Smalkin.

MGRE had one particularly favorable lease with Simon in Las Vegas. The Trustee's expert valued the lease at between $3 and $5 million. Simon was interested in obtaining a reversal of the Bankruptcy Court's extension order so that it could obtain immediate possession of the premises and lease them to another tenant at a much higher rent.

While the appeal was pending, Simon and the Trustee entered into settlement negotiations. In furtherance of those discussions, on the evening of March 27, 1996, Ronald Tucker, the lawyer representing Simon, faxed to Joel Sher, an attorney representing the Trustee, a draft stipulation and agreed order embodying the settlement terms. Under the agreement the Trustee was to give Simon immediate possession of the Las Vegas premises and many other leased properties. In return, Simon was to pay to the Trustee $700,000 and waive any and all claims it had against the bankruptcy estate, including those for unpaid rent. The $700,000 was to be paid and the claims were to be waived regardless of the outcome of the pending appeal. In the event the Trustee prevailed on the appeal and Judge Smalkin affirmed the Bankruptcy Court's extension order, Simon was to pay an additional $1.5 million.

Each side would receive something and give something up under this agreement. Simon would pay $700,000 and waive its claims even if the extension order were reversed. On the other hand, if the extension order were affirmed, the Trustee would receive only $2.2 million (plus the waiver of claims), despite the fact that in the opinion of her expert, the Las Vegas lease had a value between $3 and $5 million.[1]

On the morning of March 28, 1996, Tucker and Sher discussed the draft stipulation over the telephone. This was the first time the two of them had spoken. The conversation concluded at 10:21 a.m. By the end of the conversation an oral agreement had been reached. During the evidentiary hearing held before the Bankruptcy Court, Sher testified "I felt that he [Tucker] had agreed and I had agreed and that was the end of it." Tucker testified "that we had reached an understanding as to the terms of the proposed stipulation." The business terms of the agreement remained the same as had been set forth in Tucker's faxed draft of March 27th. The stipulation provided that it was to become effective when it was approved and signed by the Bankruptcy Court. Because the parties anticipated that Judge Smalkin might rule promptly, it was also understood that time was of the essence and that Sher would place the stipulation before the Bankruptcy Court by an emergency motion.

In fact, Judge Smalkin ruled even more quickly than the parties expected. On the morning of March 28th—the day before the landlords' reply brief was due—Judge Smalkin's secretary called the lawyers who had been directly involved in the appeal and advised them to come to his chambers to pick up his opinion. Joyce Kuhns, an attorney representing Simon on the appeal, received her telephone call at 10:20 a.m., while Tucker and Sher were still speaking on the phone. Neither Sher nor Tucker was immediately advised that Judge Smalkin's opinion was being issued.

At 10:30 a.m. the attorneys for the Trustee and the landlords met in Judge Smalkin's chambers and received his opin-

---

1. Simon's waiver of claims was of only nominal value in 1996 because there was no foreseeable likelihood that the bankruptcy estate would ever have sufficient assets to pay those claims. Although it is not material to the issues presented on appeal, it is interesting to note that the claims now have substantial value because the bankruptcy estate presently has substantial assets as the result of a lucrative settlement the Trustee obtained in a malpractice action she instituted against an accounting firm.

ion. Judge Smalkin reversed the Bankruptcy Court's extension order. Sher was advised of that fact at around 10:40 a.m. He immediately left his office "and took a little walk" because he "thought this was a disastrous event in the bankruptcy case" and "the wind was knocked out of my sails."[2] Tucker was still unaware of Judge Smalkin's decision. At 11:20 a.m. he signed and faxed a final version of the stipulation to Sher. At 11:38 a.m. he received a voice mail message from Kuhns. When he returned her telephone call at 11:59 a.m., she advised him of Judge Smalkin's ruling.

At 11:41 a.m., between the time Kuhns left her voice mail message and Tucker returned her call, Tucker received a fax from Ray Altman, a lawyer who had generally represented MGRE in real estate transactions and who was retained by the Trustee to review what she characterized as "cookie-cutter" lease matters.[3] Altman was the first lawyer with whom Tucker had discussed a possible settlement of the MGRE/Simon leases while the Bankruptcy Court's extension order was on appeal after Tucker had been referred to him by a representative of the Trustee's real estate consultant. In his 11:41 a.m. fax Altman raised various objections to the proposed stipulation sent out on the evening of March 27th and stated that he "further reserve[d] the right to submit additional comments" after he had had an opportunity to confer with the Trustee and Sher.

**2.** According to his hearing testimony before the Bankruptcy Court, Sher "didn't even think about Tucker because that was basically a closed matter." The Bankruptcy Court appropriately did not address the credibility of this assertion since it was not essential to its analysis of the issues.

**3.** I mention Altman's fax because it forms part of the series of events that occurred on March 28th. The Bankruptcy Court, however, found Altman's involvement to be "a red herring." I do not disagree with that conclusion in light of the Bankruptcy Court's finding that Sher had advised Tucker (in response to an inquiry made by Tucker) during their telephone call that he was fully authorized to enter into the settlement agreement. Therefore, Altman's 11:41 a.m. fax was legally immaterial.

To the extent that the Trustee attempts to color the case by pointing out that the Bankruptcy Court found that Tucker's initial withdrawal from the stipulation on the basis of Altman's fax was a "fabrication," a few comments are in order. Of course, in retrospect it would have been more forthright for Tucker to advise Sher immediately upon his learning of Judge Smalkin's ruling not only that Simon was withdrawing from the agreement because of Altman's fax but also that it considered the agreement to be of no force and effect. It would have been equally forthright for Sher to have immediately telephoned Tucker when Sher learned about Judge Smalkin's decision to advise Tucker that he believed the agreement to remain in full force and effect despite Judge Smalkin's ruling. At the least, it might have been appropriate for Sher to remain in his office to have a conversation with Tucker about the matter. However, this is not a morality tale, and there is no reason to infer that either Sher or Tucker acted in bad faith. They were faced with rapidly changing circumstances and took reasonable, moderate steps to protect their clients' positions until the issues could be sorted out.

Further, to appreciate Tucker's position, it is necessary to consider the circumstances as he contemporaneously perceived them to be. He had first been put in touch with Altman by a representative of the Trustee's real estate consultant, he had next been told by Sher that Sher had complete negotiating authority, and he then received a fax from Altman reserving the right to comment further on the terms of the proposed agreement. In fact, according to the Trustee's testimony, she had not authorized Altman to have any substantive role in the negotiations with Simon. Altman had not received a copy of the fax sent out by Tucker to Sher on the morning of March 28th, and Altman was acting on his own in commenting upon the draft faxed the evening before. These facts may all be so. However, they were not communicated to Tucker by Sher, Altman, the Trustee, or anyone else. From his perspective, he could reasonably believe that he had been forced to expose his client to the terms of the proposed settlement without the Trustee being similarly bound. Indeed, as a practical matter, there was no mutuality in the parties' relationship. Given the paper record established by Altman's 11:41 a.m. fax, it would have been virtually impossible for Simon to attempt to enforce the agreement if Judge Smalkin's ruling had been different and the parties' roles in this litigation reversed.

Approximately an hour later, at 12:51 p.m., Tucker faxed a letter to Sher withdrawing from the stipulation on the basis of Altman's fax. Sher did not immediately respond. Instead, the Trustee sought a stay and proceeded with an expedited appeal of Judge Smalkin's ruling.[4] The Fourth Circuit acted promptly, dismissing the appeal as interlocutory in nature. In the wake of the dismissal, the Trustee signed the stipulation on April 1, 1996. The Bankruptcy Court approved it three years later when it issued the order that is the subject of this appeal.

## II.

Simon contends that the parties did not intend to create a contract unless they obtained Bankruptcy Court approval of their stipulation before Judge Smalkin ruled on the pending appeal of the extension order. The Trustee argues that the agreement was final and binding as of the end of the telephone conversation between Tucker and Sher at 10:21 a.m. on March 28th. I find Simon's view to be correct for three separate reasons.[5]

First, it is undisputed that the parties considered time to be of the essence and that Sher was to present the stipulation to the Bankruptcy Court for approval by emergency motion as soon as possible. If, in fact, the parties' obligations had become fixed at 10:21 a.m., there would have been no need for "emergency" action before Judge Smalkin ruled.

Second, the Trustee's interpretation of the agreement is objectively unreasonable.

Both parties were, of course, taking risks under their agreement. Simon ran the risk of paying too much ($700,000 plus waiver of all its claims against the estate) in the event that Judge Smalkin reversed the extension order. The Trustee, on the other hand, ran the risk of receiving too little in the event that Judge Smalkin affirmed the extension order. At the same time, both parties stood to gain from what the other was giving up. There was a reasonable give and take. That would not have been so, however, under the Trustee's interpretation that the parties' obligations became fixed at 10:21 a.m. before Bankruptcy Court approval of the stipulation had been obtained. In that event, Simon was running an additional risk which, as a practical matter, was entirely unilateral. If, as in fact happened, Judge Smalkin reversed the extension order between 10:21 a.m. and the time the stipulation was presented to the Bankruptcy Court for approval, there was little doubt that the approval would be forthcoming since the stipulation benefitted other creditors by adding value to the estate in return for next to nothing. In contrast, if Judge Smalkin had affirmed the extension order, other creditors inevitably would have challenged the proposed settlement on the ground that it did not adequately compensate the estate for the Las Vegas lease, and the Bankruptcy Court may well not have approved it. Simon and the Trustee, and Tucker and Sher, are knowledgeable and sophisticated professionals, and it is unreasonable to infer that they agreed that

---

**4.** Simon points out that the Trustee's pursuit of the appeal in regard to Simon's leases was inconsistent with her asserted understanding that a final and binding settlement agreement had been reached. If Sher believed that the discussions with Tucker were "a closed matter," *see* note 1, *supra*, he should have made sure that the Trustee immediately turned over to Simon the keys to its premises. Perhaps his failure to do so can be explained by the exigency of the circumstances and the need to attend to the expedited appeal. However, it ill behooves a party to accuse another of bad faith, as the Trustee does Simon, when its

own actions are subject to question. It was only after dismissal of her appeal by the Fourth Circuit that the Trustee chose to sign the stipulation.

**5.** In light of my ruling on this point, I do not reach Simon's other arguments that the oral agreement was not effective because the parties intended their agreement not to be binding until it was in writing and that they conditioned the creation of a binding agreement upon the execution by both parties of the stipulation.

Simon was to be placed in such a position of unreciprocated risk.

Third, the language of the stipulation itself reflects the futurity of the agreement the parties had reached. Paragraph 8 provided that "[t]his Stipulation will only become effective upon its approval by the Court." Paragraph 3 referred to "the appeal currently pending before the U.S. District Court of Maryland." Ironically, although he thought it was, this recital was not even true when Tucker signed and faxed the final version of the stipulation at 11:20 a.m. The material legal point, however, is that read together, paragraphs 8 and 3 objectively demonstrate the parties' intent that at the time the stipulation became effective, the appeal to the District Court would still be pending.[6]

---

6. I have given "due regard" to the credibility determinations made by the Bankruptcy Court. Fed.R.Bankr.P. 8013. In the final analysis, however, this case does not turn upon credibility. Although there were some variations in the testimony between Tucker and Sher, on material issues their testimony was consistent with one another. Neither asserted that they had specifically discussed what the respective rights and obligations of Simon and the Trustee would be in the event that Judge Smalkin ruled before the Bankruptcy Court approved the stipulation. If they had contradicted one another on that point, the Bankruptcy Court's credibility determination would have been critical. Tucker and Sher however, both testified they believed an agreement had been reached by 10:21 a.m.

In short, the critical question is not whether there was an agreement but what the agreement was. Resolution of that question turns not upon determining who was telling the truth but upon analyzing the objective reasonableness of the parties' respective positions. *See Slice v. Carozza Properties, Inc.*, 215 Md. 357, 137 A.2d 687, 693 (1958).