THE BINSWANGER COMPANIES

v.

MERRY–GO–ROUND ENTERPRISES, INC., MGR Distribution Corporation, MGRR, Inc., Deborah Hunt Devan, Trustee, and Keen Realty Consultants, Inc.

No. CIV. JFM–00–3192.

United States District Court, D. Maryland.

Feb. 13, 2001.

See also 218 B.R. 361, 231 B.R. 241.

Roger Frankel, Swidler, Berlin, Shereff, Friedman, LLP, Washington, DC, for Merry–Go–Round Enterprises, Inc.

Cynthia L. Leppert, Law Office, Baltimore, MD, for appellees.

Howard A. Rubenstein, Baltimore, MD, for Keen Realty Consultants, Inc.

### MEMORANDUM OPINION

MOTZ, Chief Judge.

In bankruptcy court, the Binswanger Companies ["Binswanger" or "appellant"] sought payment of a commission on a sale of real estate formerly owned by a Chapter 7 debtor. Part of Binswanger's case survived a motion to dismiss, *Binswanger Cos. v. Merry–Go–Round Enters., Inc. (In re Merry–Go–Round Enters., Inc.)*, 218 B.R. 361 (Bankr.D.Md.1998) ("*Binswanger I*"), and the bankruptcy judge later denied summary judgment for Binswanger. *Binswanger Cos. v. Merry–Go–Round Enters., Inc. (In re Merry–Go–Round Enters., Inc.)*, 231 B.R. 241 (Bankr.D.Md.1999) ("*Binswanger II*"). After a trial, the bankruptcy judge denied payment, and Binswanger appeals to this Court. Binswanger argues that the bankruptcy court erred in refusing to appoint Binswanger nunc pro tunc as a broker for the estate, and that Binswanger is entitled to a commission under a Maryland statute protecting the rights of real-estate brokers who are the "procuring cause" of sales.

### I.

With this opinion, the number of published opinions addressing the bankruptcy of Merry–Go–Round Enterprises and its affiliates ["MGRE"] reaches a round dozen. *Devan v. Simon DeBartolo Group, L.P. (In re Merry–Go–Round Enters., Inc.)*, 180 F.3d 149 (4th Cir.1999); *Simon Props., L.P. v. Devan*, 249 B.R. 269 (D.Md. 2000); *In re Merry–Go–Round Enters., Inc.*, 244 B.R. 327 (Bankr.D.Md.2000); *In re Merry–Go–Round Enters., Inc.*, 241

B.R. 124 (Bankr.D.Md.1999); *Binswanger II*, 231 B.R. 241; *Devan v. CIT Group/Commercial Servs., Inc. (In re Merry–Go–Round Enters., Inc.)*, 229 B.R. 337 (Bankr.D.Md.1999); *In re Merry–Go–Round Enters., Inc.*, 227 B.R. 775 (Bankr. D.Md.1998); *Ernst & Young v. Devan (In re Merry–Go–Round Enters., Inc.)*, 222 B.R. 254 (D.Md.1998); *Binswanger I*, 218 B.R. 361; *In re Merry–Go–Round Enters., Inc.*, 208 B.R. 637 (Bankr.D.Md.1997); *In re Merry–Go–Round Enters., Inc.*, 1996 WL 69688 (Bankr.D.Md. Jan.23, 1996). The facts relevant to this appeal in particular are detailed here. To round out the story, the reader should consult the other opinions; familiarity with *Binswanger I* and *Binswanger II* is presumed.

In late 1995, Binswanger first introduced the May Department Stores Company ("May") to the availability of a warehouse owned by MGRE. Pl.'s Exs. 1, 4, 5, 7, 8. Binswanger had done prior work for May, commonly referred to May as its "client," and had assigned a particular employee to keep in touch with May. Deposition Designation 1 at 31–32. In January 1996, agents of Binswanger showed agents of May around the warehouse, with the permission of agents of the debtor in possession. Pl.'s Exs. 13, 24. On February 1, 1996, the *Baltimore Sun* ran an article suggesting that the warehouse might be for sale. Def.'s Ex. 21.

May sent its first offer on the property, dated February 27, 1996, to Binswanger. Binswanger Ex. 1; Pl.'s Exs. 50, 52, 53. May offered $15 million and required removal of certain equipment from the warehouse by the seller. At the time of this offer, Binswanger was negotiating with the debtor in possession for a written agency agreement, a negotiation that had begun before and continued until well after this offer. *See* Pl.'s Exs. 3, 11, 14, 17–20, 22, 29–33, 47. MGRE's board had directed the officers to pursue such an agreement, Pl.'s Ex. 23, and then delayed action to see what happened in bankruptcy court. Def.'s Ex. 27. Binswanger transmitted the first offer to MGRE on March 5, 1996. At the end of February, according to Tim Meyer, a vice-president of May who was involved with the purchase of the property throughout, May was not ready and willing to pay $19 million (the eventual purchase price) for the property. Deposition Designations 2A at 45–47.

On March 1, 1996, the court converted the cases of the debtors in possession to Chapter 7. On that date, Binswanger had no written agency agreement with the debtors in possession. Pl.'s Ex. 59. Neither the debtor in possession nor the trustee, Deborah Hunt Devan, has ever applied for court approval to employ Binswanger under 11 U.S.C. § 327(a). Instead, in March 1996, Devan asked for and won court approval of the appointment of another brokerage firm. Pl.'s Ex. 60, 89, 92, 100. The other brokerage firm spoke with no potential purchasers until retained by the court. Deposition Designation C at 79.

On March 25, 1996, May sent a second offer directly to the trustee. Binswanger Ex. 2; Pl.'s Exs. 82–84. May offered $16.5 million, and no longer required the removal of the equipment. The trustee rejected this offer. At this time, according to Tim Meyer of May, May was not ready or willing to pay $19 million. Deposition Designations 2A at 53. May was considering three other properties at this time, as well as expanding its existing property rather than purchasing another one. Deposition Designations 2B at 58. May included language in this offer to specify that the seller should pay a fee to Binswanger.

In letters dated March 25, 1996, and April 22, 1996, the trustee plainly revoked any employment relationship between Binswanger and the trustee that was derived from Binswanger's prior relationship with the debtor in possession. Pl.'s Exs. 85, 101.

From March 25 until the deal was done, Binswanger's communication with May was limited to attempting to secure its commission. Deposition Designations 2B

at 66–68. In early May 1996, Binswanger asked May to confirm Binswanger's status as procuring broker in writing. Pl.'s Exs. 102–04.

In the next round of negotiations, on May 29, 1996, in a letter to the trustee, May offered $16.5 million with the equipment left in place, or in the alternative $18 million with the equipment removed. Binswanger Ex. 3. May noted "the lack of any response to Purchaser's earlier inquiries regarding the property." *Id.*

On June 6, 1996, the *Baltimore Sun* published an article indicating that The Gap, a clothing company, had offered $18 million for the warehouse. Def.'s Ex. 82A.

On June 12, 1996, May made an offer that was ultimately accepted. Binswanger Ex. 6; Pl.'s Ex. 114; Def.'s Ex. 68. May bought the warehouse from the bankruptcy trustee, Deborah Hunt Devan, in August 1996. May paid $19 million, and Devan was not required to remove certain materials handling equipment from the warehouse. Binswanger received no commission. Binswanger employees do not recall Binswanger playing any role in persuading May to accept the equipment along with the warehouse. Deposition Designations 1B at 218–19; 1E at 59. By July 4, 1996, negotiations were intense and May was seriously committed to the MGRE property instead of others it had been considering. Deposition Designations 2B at 72.

■ The bankruptcy court's findings of fact are reviewed under a "clearly erroneous" standard, and its conclusions of law are reviewed de novo. *First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 667 (4th Cir.1995).

## II.

■ Binswanger argues that it was the "procuring cause" of the sale to May, and that Maryland law therefore entitles it to a commission on the sale. Md.Code Ann. Real Prop. § 14–105. Maryland law roundly prohibits collection "in a court of the State" by a person who is not licensed in Maryland as a real-estate broker, for activities for which Maryland requires a real-estate broker's license. Md.Code Ann., Bus. Occ. & Prof. § 17–516. An unlicensed broker may not receive payment for services required by state statute to be performed by a licensed broker. *Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 790–92 (4th Cir.1987). The relevant statutes are "clearly designed to protect the public, not merely to raise revenue," and "[i]n general, courts will not enforce contracts made in derogation of statutes designed to protect the public." 825 F.2d 787, 790; *see also St. Paul Mercury Ins. Co. v. Duke Univ.*, 849 F.2d 133, 135 (4th Cir.1988).

■ Binswanger's several efforts to get around this plain statutory prohibition fail. The bankruptcy court analyzed the applicability of § 17–516 to Binswanger's claim, and denied summary judgment in an alternative holding. *Binswanger II*, 231 B.R. at 249. The "only individuals ... who have been identified as having been involved on behalf of Binswanger in performing services" on the deal at issue do not hold Maryland real estate licenses. *Id.; see* Def.'s Exs. 70–72. For the reasons well stated by the bankruptcy court in denying summary judgment, the employment by the Binswanger Companies of a licensed Maryland real estate broker who did not work on the deal does not give Binswanger a roundabout route to collection. 231 B.R. at 247–49. Binswanger has not challenged the bankruptcy court's findings of fact on this issue. Maryland law bars Binswanger from collecting under a "procuring cause" theory.

■ If the license requirement did not bar Binswanger's recovery on a "procuring cause" theory, Binswanger would still not recover, because it has failed to show that the bankruptcy court's finding that it was not the procuring cause of the sale was clearly erroneous. Binswanger had the burden of proof on this issue.

"[W]hether the broker was the procuring cause of the lease is ordinarily ... a question of fact," *Weinberg v. Desser,* 243 Md. 347, 355, 221 A.2d 66, 70 (1966), and is accordingly reviewed for clear error. *Stanley,* 66 F.3d at 667. Binswanger agrees with the bankruptcy court's legal conclusion that to be the procuring cause of the sale, Binswanger had to have found a purchaser who was "ready, able, and willing" to meet the seller's terms before the broker's termination. Binswanger Brief at 20. Although it claims to challenge a conclusion of law, it actually challenges a factual finding.

Binswanger argues that before Binswanger's termination on March 25, May was "ready, willing, and able" to pay what the trustee wanted. According to Binswanger, the final stages of the months-long exchange of offers and responses between the trustee and May were "essentially bankruptcy-related and/or legal negotiations." Binswanger Brief at 15. The eventual purchase price, however, was 15 % higher—in round numbers, $2.5 million higher—than the March 25 bid, made as the trustee dismissed Binswanger. This difference is a dollars and cents one. Moreover, Binswanger's argument that May was "ready, willing, and able" in March to pay what it eventually paid in August contradicts testimony by Tim Meyer of May. Meyer testified that as of the end of March, when the trustee clearly terminated any employment relationship Binswanger might have had with the estate, May was not ready or willing to pay $19 million. Deposition Designations 2A at 53; *see also* Pl.'s Ex. 99. Meyer described the progress of May's interest in the warehouse as it looked around at other properties and explored the possibility of expanding its own instead. Except for the nature of the negotiation, Binswanger provides no support for its contention that although May offered less in March, it was then ready, willing, and able to pay more. The bankruptcy court's decision to credit

the contrary testimony was far from clearly erroneous.

## III.

■ To receive compensation, professionals doing work for a debtor in possession must be appointed by the court under 11 U.S.C. § 327(a), having met certain statutory requirements. *Atkins v. Wain, Samuel & Co. (In re Atkins),* 69 F.3d 970, 973 (9th Cir.1995); *In re Jarvis,* 53 F.3d 416, 418 (1st Cir.1995); *Harold & Williams Dev. Co. v. U.S. Trustee (In re Harold & Williams Dev. Co.),* 977 F.2d 906, 909 n. 1 (4th Cir.1992). It is undisputed that Binswanger has never been so appointed.

■ Whether or not Binswanger met the statutory requirements under 11 U.S.C. § 327(a), it has failed to establish circumstances justifying it in performing first and requesting retroactive appointment later. The law in this area is unsettled, but most courts have permitted retroactive appointment in some circumstances. *See Jarvis,* 53 F.3d at 421 (permitting retroactive appointment and citing similar holdings in several other circuits); Bruce H. White & Maria H. Belfield, *Under What Circumstances Will A Court Authorize Nunc Pro Tunc Employment of a Professional?,* Am. Bankr.Inst. J., Sept. 17, 1998; Rosemary Williams, Annotation, *Approval of Employment of Professional Persons Under 11 U.S.C.A. § 327(a) and Bankruptcy Rule 2014 Nunc Pro Tunc,* 133 A.L.R. Fed. 465 (1993).

Several circuits are cautious in permitting retroactive appointment, requiring some sort of extraordinary circumstances.[1] The Ninth Circuit requires "professionals seeking retroactive approval [to] satisfy two requirements: they must (1) satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that their services benefitted the bankrupt estate in a significant manner." *Atkins,* 69 F.3d at 974. The First Circuit requires,

---

1. The Fourth Circuit has not established a test    for retroactive appointment.

beyond the statutory requirements for any appointment, "that the delay in seeking court approval resulted from extraordinary circumstances," which do not include, for example, "tardiness occasioned merely by oversight." *Jarvis,* 53 F.3d at 418. Binswanger meets neither the Ninth Circuit's nor the First Circuit's test. From the beginning of its involvement with the prospective sale of the warehouse, Binswanger was well aware of the statutory requirement and that it had not met that requirement, and chose to continue serving the estate despite it. Pl.'s Exs. 1, 38, 57, 59, 66, 97; Def.'s Ex. 29; 73 at ¶ 13.

The Seventh Circuit has adopted a more lenient test of "excusable neglect." *In re Singson,* 41 F.3d 316 (7th Cir.1994). However, Binswanger cannot satisfy even this test. Binswanger's failure to be appointed was far more than one of the "oversights" or "record-keeping errors" with which the Seventh Circuit was concerned. 41 F.3d at 319.

For these reasons, the judgment of the bankruptcy court is affirmed.